**John J. & Jacqueline Ann DuPHILY, Plaintiffs,**

**v.**

**Georgina DuPHILY and Joel D. Tenenbaum, Defendants.**

**Civ.A. No. 85–190 CMW.**

United States District Court, D. Delaware.

Aug. 15, 1985.

Kathleen A.T. Irwin, UAW–GM Legal Services Plan, Newark, Del., for plaintiffs.

Melvyn A. Woloshin, Woloshin, Tenenbaum & Natalie, Wilmington, Del., for defendants.

## MEMORANDUM OPINION

CALEB M. WRIGHT, Senior District Judge.

John DuPhily and his wife, Jacqueline, appeal from an order of the Bankruptcy Court dated February 21, 1985, holding that arrearages for child support and attorney's fees were non-dischargeable debts in bankruptcy. The issue on appeal is whether arrearages owed for the support of an illegitimate child of one of the debtors is a non-dischargeable debt within the meaning of 11 U.S.C. § 523(a)(3) prior to that provision's amendment in July of 1984.

Daniel Henshaw is the illegitimate son of John DuPhily and Georgina DuPhily. Despite the common surname, Georgina and John have never been married to each other. Georgina acquired her surname through marriage to John's brother subsequent to Daniel's birth. John has never adopted or otherwise legitimized the child.

On August 13, 1984, the Family Court of the State of Delaware entered an order directing John DuPhily to make child support payments to Georgina DuPhily for current support and for arrearages extending back to July 1983. The arrearages amount to $4,313.90. A supplemental order was entered on September 14, 1984 requiring John DuPhily to pay attorney's fees for the support action to Georgina DuPhily's attorney, Joel Tenenbaum. The wages of John DuPhily were attached in the amount of $90.00 per week of which $32.80 per week were for arrearages.

There has been no attachment proceeding in connection with the attorney's fees.

On September 26, 1984, appellants filed a voluntary petition in bankruptcy pursuant to Chapter 11. The petition listed both the arrearages and the attorney's fees as obligations. On December 19, 1984, appellants filed a complaint to determine the dischargeability of the two foregoing unsecured debts. Taking the position that § 523(a)(5), read literally, does not include debts arising from court ordered child support which is not "in connection with a separation agreement, divorce decree, or property settlement agreement", the appellants maintained that the debts in question should be dischargeable. The bankruptcy judge, however, reached a contrary result based on an equitable reading of the statute that relied on the legislative history of subsequent amendments to the provision and on her conviction that any construction that denied illegitimate children the same protection afforded to legitimate children as creditors would be unconstitutional.

Although this Court cannot agree with the bankruptcy judge's construction of § 523(a)(5), it shares the constitutional misgivings expressed in her opinion. Subjecting § 523(a)(5), properly construed, to constitutional scrutiny leads this Court to conclude that the provision denies the creditors in this case equal protection of the laws. Accordingly, the Court affirms the court's decision below in view of the provision's inherent constitutional infirmity.

STATUTORY CONSTRUCTION

Section 523(a) of the Bankruptcy Reform Act of 1978, as originally enacted, provided in part:

(a) A discharge under Section 727, 1141, or 1328(b) of this title does not discharge an individual from any debt— ...

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree, or property settlement agreement....

11 U.S.C. 523(a), Pub.L. 95–598, 92 Stat. 2590 (1978).

This section, by providing that child support obligations would be non-dischargeable debts only if they arose "in connection with a separation agreement, divorce decree, or property settlement", effectively precluded the non-dischargeability of support obligations to illegitimate children even when such obligations were the result of a court order. Making the non-dischargeability of child support obligations dependent on the nature of the underlying judicial decree creating the obligation has been uniformly criticized by courts.

In spite of several amendments to § 523(a)(5) over the years, Congress did not get around to amending this defect until July of 1984 in the Bankruptcy Amendments and Federal Judgeship Act of 1984. The amendment was achieved by inserting the phrase "or other order of a court of record" in the "in connection" clause of subsection (5). Senator Exon explained that the amendment was meant to correct "a grave oversight" in the Bankruptcy Reform Act. 130 Cong.Rec. § 6094 (daily ed. May 21, 1984). Senator Hatch, concurred, expressing his own view that the amendment remedied the earlier "defect". *Id.* at § 6095.

The appellants did not file their petition in bankruptcy until September 26, 1984, nearly 2½ months after enactment of this amendment. The effective date of the amendment, however, was not until 90 days after enactment, that is, October 8, 1984. Pub.L. 98–353, § 553, 98 Stat. 392 (1984). Thus, this action is controlled by the pre-amended version of § 523(a)(5).

Courts in construing this provision have divided on what effect to give to the "in connection" clause. *Compare In re Brown,* 43 B.R. 613 (Bankr.M.D.Tenn.1984) (held debtor's obligation arising from a state court judgment in a paternity suit to pay medical expenses incurred in connection with the debtor's illegitimate child was dischargeable); *In re Richards,* 33 B.R. 56 (Bankr.D.Ore.1983) (holding debts for child support which were not incurred in connection with separation agreement, divorce de-

cree, or property settlement agreement were dischargeable); *In re Marino,* 29 B.R. 797 (N.D.Ind.1983) (same) *with In re Balthazor,* 36 B.R. 656 (Bankr.E.D.Wis. 1984) (held support obligations arising out of paternity suits was non-dischargeable debts); *In re Mojica,* 30 B.R. 925 (Bankr.E. D.N.Y.1983) (same); *In re Cain,* 29 B.R. 591 (Bankr.N.D.Ind.1983) (same).

The construction of § 523(a)(5) adopted by the courts in *Balthazor, Mojica,* and *Cain* is somewhat surprising in view of uniform agreement among courts that the literal terms of the provision exclude child support obligations which are not "in connection with a separation agreement, divorce decree or property settlement agreement." Moreover, the general rule in construing discharge provisions in bankruptcy, namely, that exceptions to dischargeability are strictly construed to afford debtors a fresh start, *see Gleason v. Thaw,* 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915), would in this case argue for dischargeability of the debt.

Those courts who have nevertheless been inclined to overlook the specific limitations of § 523(a)(5) have done so on two grounds: (1) Congress did not intend to permit debtors to discharge child support obligations to illegitimate children regardless of the statute's literal meaning; and (2) in order to avoid thorny constitutional issues, it is necessary to ignore the provision's specific limitations. Each of these proffered grounds bears closer examination.

The first relies on a highly subjective reading of Congressional intent, heavily influenced by courts' perception of the underlying equities. Courts favoring a broad construction of the non-dischargeability provision contained in § 523(a)(5) have generally emphasized the longstanding policy against discharging debtors' child support obligations under the bankruptcy laws prior to enactment of the Bankruptcy Reform Act. Although the Bankruptcy Act of 1898 as originally enacted contained no such provision, courts were quick to read such a policy into the bankruptcy laws. *See Wetmore v. Markoe,* 196 U.S. 68, 77, 25 S.Ct.

172, 176, 49 L.Ed. 390 (1904) ("courts should not presume a design upon the part of Congress in relieving the unfortunate debtor to make the law a means of avoiding enforcement of the obligation, moral and legal, ... to maintain and educate his children."). This legislative omission was remedied shortly thereafter through the addition of Section 17(c)(7) to the Bankruptcy Act.

The failure of Congress to articulate explicitly an intent to eliminate this longstanding policy should, according to this argument, decisively favor construing § 523(a)(5) to extend non-dischargeability to support obligations beyond those arising "in connection" with the enumerated decrees. In a thoroughly developed presentation of this argument, one bankruptcy court noted that the provision's crucial language was the result of a last-minute compromise between House and Senate conferees aimed at curing an entirely different problem. *See In re Mojica, supra,* 30 B.R. at 930 (*quoting* 124 Cong.Rec. H11864–66 (daily ed. Oct. 6, 1978)). The court went on to diagnose the provision's problem as one of "overdrafting", concluding that the statute "is simply not an accurate codification of true congressional intent." *Id.* at 931.

While sympathetic to the equitable nature of the concerns motivating these courts, this Court is reluctant to rewrite statutes for Congress based on its own view of a statute's equities. This view is nothing more than a corollary to the canon of construction requiring that a statute, in the first instance, be construed in accordance with its plain meaning. *See Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917); *accord United States v. Pennsylvania Environmental Hearing Board,* 584 F.2d 1273, 1281 n. 26 (3d Cir.1978). While the pursuit of literalism in statutory construction may prove illusory at best and quite possibly, misleading, *see Guiseppi v. Walling,* 144 F.2d 608, 624 (2d Cir.1944) (L. Hand, J. concurring), disregarding a statute's plain meaning is no antidote to uncritical literalism.

The divergence among courts regarding the question of construction in this case is caused not by any ambiguity regarding the meaning of the statute's language, but rather by the feeling of some courts that Congress erred in drafting the Bankruptcy Reform Act of 1978. Although the court in *In re Adamo*, 619 F.2d 216 (2d Cir.), *cert. denied*, 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 52 (1980), accepted an argument based on "legislative error" in disregarding another provision of the Bankruptcy Reform Act, there the problem was limited to an inconsistency in the effective date of a provision enacted to replace another provision. While *Adamo* may identify exceptional circumstances for setting aside an apparent legislative error in drafting, the purported error in this case is neither so obvious nor so uncontroverted as to merit similar treatment. In this day and age, it is perhaps too much to hope that the boundaries between legislative and judicial functions can be located with any precision. From this Court's perspective, however, statutes that do not accurately codify congressional intent should preferably be amended through legislative action rather than through statutory construction.

A second ground urged by some courts for reading the "in connection" clause out of § 523(a)(5) has been to avoid deciding serious questions regarding the provision's constitutionality. While the importance of avoiding unnecessary issues of constitutional law as a policy of adjudication is well-established, *see Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 341–356, 56 S.Ct. 466, 480–87, 80 L.Ed. 688 (1936), (Brandies, J. concurring), the purpose of that policy was never to confer on the judiciary a license to rewrite language enacted by the legislature solely to avoid holding a statute unconstitutional. *See United States v. Albertini*, —— U.S. ——, 105 S.Ct. 2897, 2902, 86 L.Ed.2d 536 (1985).

The distinction between permissible construction and covert revision may not always be clear, but construction presupposes, at the very least, some ambiguity admitting to more than one interpretation. The logic of "reinterpreting" any statute that may exhibit constitutional infirmities would preclude constitutional review of statutes altogether for any constitutional defect could be willfully ignored under the guise of interpretation. The resulting policy would turn considerations of judicial self-restraint on its head, giving rise to a pernicious form of judicial activism in which constitutional issues, rather than being addressed squarely, would invariably be decidedly sub silentio through statutory construction.

In this particular case, there is no question of statutory ambiguity and thus no other construction of the statute is appropriate. Despite serious doubts as to the constitutionality of the provision, these doubts are not themselves a basis for construing the statute differently from its plain meaning. The debt presently in question did not arise "in connection with a separation agreement, divorce decree, or property settlement" and accordingly, it is not non-dischargeable within the meaning of § 523(a)(5).

## CONSTITUTIONAL ANALYSIS

Having determined that § 523(a)(5), properly construed, would require this Court to discharge the debts presently in question, this Court must consider appellee's constitutional argument as an alternate grounds for affirming the bankruptcy court's decision below. On its face, there is nothing objectionable about § 523(a)(5). The section provides that debts for child support which arise in connection with certain types of court orders, will be non-dischargeable. In so providing, however, the statute excludes debts for child support resulting from other types of court orders. Court ordered child support for illegitimate children will seldom, if ever, be entered in connection with the types of court orders required by § 523(a)(5) and thus, such debts cannot be protected from discharge in bankruptcy. Thus, in effect, § 523(a)(5) results in disparate treatment of illegitimate and legitimate children as creditors for debts arising from judicial decrees creating support obligations.

■ As a matter of first impression, the bankruptcy laws are presumed to be a valid exercise of the discretion vested in Congress pursuant to Article I of the Constitution over matters of commerce and social welfare. *See United States v. Kras*, 409 U.S. 434, 446, 93 S.Ct. 631, 638, 34 L.Ed.2d 626 (1973); *In re Ashe*, 669 F.2d 105, 110 (3d Cir.1982). Since the bankruptcy laws inherently involve an adjustment of rights and obligations between debtors and creditors based on a system of classifying creditors' that system is entitled to an initial presumption of constitutional validity. Just as no individual has a constitutional right to discharge his debts in bankruptcy, *id.* 409 U.S. at 446, 93 S.Ct. at 638, so too, it might be argued, no creditor is constitutionally protected from discharge.

■ The presumptive validity of the different treatment of creditors, however, does not insulate the system of classifying creditors from the requirements of equal protection of the laws merely because the system for classifying creditors was mandated by Congress. No one would seriously argue that Congress could condition the non-dischargeability of a debt on a creditor's race. *Cf. In re Wasserman* 13 C.B.C. 611 (Bankr.D.R.I.1977) (holding unconstitutional gender based distinctions contained in Section 17a(7) of the Bankruptcy Code of 1898 [the predecessor to § 523 of the Bankruptcy Reform Act]). Indeed, other areas involving exercise of legislative discretion by Congress have been subjected to scrutiny under the equal protection component of the Due Process Clause of the Fifth Amendment. *See Vance v. Bradley*, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979) (mandatory retirement age for Foreign Service held valid); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975) (striking down certain gender based distinctions in survivors' benefits under the Social Security Act); *Jimenez v. Weinberger*, 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974) (invalidating requirements of disability benefit provisions under the Social Security Act as unnecessarily discriminatory with respect to a class of illegitimate children); *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (holding that segregated schooling in the District of Columbia violated equal protection).

The constitutional issue presented in this case is whether Congress can condition the dischargeability of court ordered obligations for child support based on the child creditor's status of birth. The different rights enjoyed by individuals solely because of their status as legitimate or illegitimate has figured prominently in the Supreme Court's development of equal protection concepts over the last twenty years. Roughly speaking, the validity of classification schemes based on status of birth has been examined in the context of four different types of laws: laws governing intestate succession, *see Lalli v. Lalli* 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978) (upholding state law restricting the right of illegitimate children to inherit from intestate father absent a court order of paternity entered during the father's lifetime); *Trimble v. Gordon*, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977) (striking down state law that prevented illegitimate child from inheriting from father through intestate succession); *Labine v. Vincent*, 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288 (1971) (holding valid a state law that barred legitimate and illegitimate children from sharing equally in the estate of an intestate father); laws concerning the maintenance of wrongful death actions, *Parham v. Hughes*, 441 U.S. 347, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979) (law limiting father's right to maintain action upheld); *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) (striking down state law that relegated unacknowledged illegitimate children to secondary rights of recovery under workmen's compensation law in connection with father's death); *Levy v. Louisiana*, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968) (holding statute that precluded illegitimate child from maintaining an action for wrongful death of mother violated illegitimate child's right to equal protection); *Glona v. American Guarantee & Liability Insurance Co.*, 391

U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968) (law limiting mother's right to recover held invalid); laws restricting benefits to illegitimate children under governmental or quasi-governmental programs; *Mathews v. Lucas*, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976) (upholding provision under the Social Security Act requiring illegitimate children of fully insured deceased in absence of certain other factors to prove dependency as a prerequisite to collecting survivors' benefits); *Jimenez v. Weinberger*, 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974) (striking down provision under the Social Security Act precluding illegitimate children born after the onset of disability from recovering disability insurance benefits); *New Jersey Welfare Rights Organization v. Cahill*, 411 U.S. 619, 93 S.Ct. 1700, 36 L.Ed.2d 543 (1973) (per curiam) (invalidating state statute that limited welfare assistance to families that did not include illegitimate children); and finally, laws restricting illegitimate children from bringing actions for child support against their fathers, *Pickett v. Brown*, 462 U.S. 1, 103 S.Ct. 2199, 76 L.Ed.2d 372 (1983) (unanimous opinion) (holding that two-year period provided under state law for establishing paternity denied illegitimate children equal protection); *Mills v. Habluetzel*, 456 U.S. 91, 102 S.Ct. 1549, 71 L.Ed.2d 770 (1982) (same for one-year period); *Gomez v. Perez*, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973) (per curiam) (striking down state law denying right of paternal support to illegitimate children).

This substantial body of law evidences "a special concern for discrimination against illegitimate children" by the Supreme Court which, in turn, requires lower courts to examine carefully any challenged legislative enactment that embodies such a discriminatory scheme. *Pickett v. Brown*, 462 U.S. at 7, 103 S.Ct. at 2203. The need for vigilance was eloquently summarized in an oft-quoted passage from *Weber v. Aetna Casualty & Surety Co.* in which Justice Powell, speaking on behalf of the Court, condemned the unconstitutionality and injustice of discrimination based on status of birth:

Imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual—as well as an unjust—way of deterring the parent. Courts are powerless to prevent the social opprobrium suffered by these hapless children, but the Equal Protection Clause does enable us to strike down discriminatory laws relating to status of birth where—as in this case—the classification is justified by no legitimate state interest, compelling or otherwise.

406 U.S. at 175–76, 92 S.Ct. at 1407.

■ Despite judicial recognition of the invidious nature of any classification based on immutable human attributes, *Parham v. Hughes*, 441 U.S. at 351, 99 S.Ct. at 1745, *accord Gomez v. Perez*, 409 U.S. at 538, 93 S.Ct. at 875, classifications based on illegitimacy are not subject to "strict scrutiny" in the same way as such obvious suspect classifications as race. *See Lalli v. Lalli*, 439 U.S. at 265, 99 S.Ct. at 523. Nevertheless, heightened concern for the diminished rights of illegitimate children requires that statutory schemes which embody such distinctions be "substantially related" to a legitimate governmental interest. *Mills v. Habluetzel*, 456 U.S. at 99, 102 S.Ct. at 1554; *see Trimble v. Gordon*, 430 U.S. at 769, 97 S.Ct. at 1464 (equal protection in these cases "requires more than the mere incantation of a proper" governmental purpose).

■ The application of this standard to § 523(a)(5) leads to the inescapable conclusion that the provision is unreasonable because it treats legitimate and illegitimate child creditors who are owed money as a result of a judicial decree differently by prohibiting the discharge of debts owed to one group while permitting the discharge of debts owed to the other without being substantially related to any justifiable governmental purpose. The most frequently

invoked governmental interest used to justify the disparate treatment suffered by illegitimate children, namely, to prevent litigation of spurious or fraudulent claims is simply inapplicable in this context. This case involves an illegitimate child who has already prevailed in a paternity suit and for whom an order of support already exists. The state court's determination that a legitimate child should receive support is entitled to no greater deference than its determination that an illegitimate child is owed support.

The provision at issue in this case closely resembles state provisions barring illegitimate children from bringing paternity suits against their father for child support. On each of the three occasions the Supreme Court has addressed this issue, the provision has been struck down. *Pickett v. Brown, supra; Mills v. Habluetzel, supra; Gomez v. Perez, supra.* While the Court doubts that this provision was enacted to punish illegitimate children for the perceived indiscretion of their parents, this Court cannot disregard the very real consequence which it has produced. The right to equal protection does not depend on showing the legislature's actually intended an improper purpose; rather the right is absolute and the absence of any proper purpose, let alone one "substantially related" to a permissible governmental interest, is sufficient to condemn the arbitrary exclusion of child support obligations arising in connection with other orders of courts of record from § 523(a)(5). Because the exclusion of the debt in question from the protection afforded by § 523(a)(5) denies the creditor equal protection of the laws, the "in connection" clause of § 523(a)(5) will be set aside insofar as it excludes debts for support arising from other court orders.

The only remaining issue concerns whether the counsel fees incurred in connection with the state court child support action are also non-dischargeable. The bankruptcy judge below found that the attorney's fees were incurred in connection with the child support action, a ruling that debtor has not challenged on appeal. Nor does this court need to address the fact that the creditor is technically the attorney for Georgina DuPhily in the state court action rather than Georgina DuPhily. Once again, this issue was not pressed on appeal and therefore, is a matter that is not before the Court.

Appellants' sole objection is that the underlying debt did not arise in connection with a separation agreement, divorce decree or property settlement agreement, and thus, the corresponding attorney's fees should also be dischargeable. While it is true that the dischargeability of ancillary obligations such as attorney's fees turn on the dischargeability of the underlying debt, *In re Chambers,* 36 B.R. 42 (Bankr.D.Wis. 1984); *In re Sposa,* 31 B.R. 307 (Bankr.D. Va.1983), the Court has already determined that the arrearages for child support are not dischargeable in bankruptcy. It follows that counsel fees for the maintenance action must also be non-dischargeable. *See In re Spong,* 661 F.2d 6 (2d Cir.1981); *In re Holt,* 40 B.R. 1009 (D.Ga.1984); *In re Meadows,* 39 B.R. 538 (Bankr.W.D.Ky. 1984).

## CONCLUSION

The scope of this decision is narrow. Although holding that § 523(a)(5) prior to its amendment in July of 1984 created an unconstitutional distinction between the rights of legitimate and illegitimate children as creditors, the constitutional defect identified in this Opinion has already been remedied by the provision's recent amendment.

An Order affirming the decision of the Bankruptcy Court will be entered.