In re Everett P. **PRIESTLEY**, Debtor.

**BENEFICIAL NATIONAL BANK, Plaintiff,**

v.

**Everett P. PRIESTLEY, Defendant.**

**Bankruptcy No. 94–621–PJW.**

**Adv. No. 95–4.**

United States Bankruptcy Court, D. Delaware.

June 6, 1996.

Melvyn I. Monzack, Wilmington, DE, for Plaintiff.

Jeffrey M. Weiner, Wilmington, DE, Pace Reich, Philadelphia, PA, for Defendant.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

### INTRODUCTION

In this Chapter 7 case, Beneficial National Bank ("Beneficial") commenced this adversary proceeding alleging that the debtor, Everett P. Priestley ("Priestley"), obtained an acquisition and construction loan based on false representations, and thus requests that Priestley's debt be deemed nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B) [1]. Alternatively, Beneficial seeks a nondischargeability determination pursuant to Code § 523(a)(2)(A). Beneficial also requests a finding that Priestley's obligation for attorney's fees, interest, costs and late charges, in addition to the principal loan balance, is nondischargeable. For the reasons set forth below, I find that Priestley's debt to Beneficial and the associated attorney's fees, costs, interest and late charges, are nondischargeable pursuant to both Code §§ 523(a)(2)(B) and 523(a)(2)(A).

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. 157(b)(2)(I).

### FACTS

At the time of the events giving rise to the subject loan transaction, Priestley was a

---

1. Citations to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, are hereinafter referred to as "Code § ——".

practicing attorney and, as a part-time real estate entrepreneur, the sole shareholder and president of Pallas Properties, Inc. ("Pallas"). In 1988, Priestley, through Pallas, sought to purchase and renovate a building at 501 Shipley Street in Wilmington, Delaware ("the Shipley Street property"). The Shipley Street property was to be converted into five condominiums units, with two units each on the second and third floors and a large unit consisting of the first floor, mezzanine and basement ("Unit One").

Sometime during the latter part of 1988, Priestley, through Pallas, applied for a loan from Beneficial in the amount of $900,000 to finance the acquisition and renovation of the Shipley Street property. Beneficial had an established lending relationship with Priestley, having previously extended him a $100,-000 commercial mortgage and a $25,000 consumer line of credit. Priestley committed to pay an $80,000 equity contribution toward the Shipley Street property, and offered as collateral the Shipley Street property, along with other property located in Pennsylvania.

Proceeds from the sale of the condominiums were earmarked to repay the loan. Priestley, through Pallas, had obtained contracts of sale for three of the five office condominium units prior to applying for the loan, and submitted those contracts as part of the loan application. Pallas had contracted with Richard E. Yerger of Ticor Title Insurance Company and with the Delaware Counsel on Crime and Justice to purchase one condominium unit each on the second and third floors, respectively. Both of these units were under contract for 1,700 square feet each, at a sales price of $160,000 each. Pallas had also contracted with Priestley himself, Jeffrey L. Olmstead ("Olmstead"), and George W. Dalphon ("Dalphon") (collectively the "Priestley Group") to purchase Unit One for $555,000. This latter contract, evidenced by a July 27, 1988 Agreement of Sale ("Agreement of Sale"), is at the heart of this controversy.

Prior to Pallas' Beneficial loan application, the Priestley Group had already received a $435,000 commitment for mortgage financing from the Bank of Delaware to purchase Unit One. Beneficial agreed it would release Unit One after collecting $475,000, the difference between the $555,000 sales price and the Pallas' $80,000 equity contribution. Dalphon and Olmstead were to contribute $40,000 for the Unit One purchase, to make up the difference between the $475,000 release price and the $435,000 Bank of Delaware mortgage loan. Doc. # 18, Ex. 4, at 2–3.

Little did Beneficial know, there was more to the Unit One purchase deal than reflected in the Agreement of Sale. The agreements actually controlling this deal consisted of (1) the Agreement of Sale; (2) a Modification Agreement ("Modification Agreement"), which Pallas and the Priestley Group and Priestley individually executed simultaneously with the Agreement of Sale; and (3) various "unwritten understandings" between Pallas and the Priestley Group. Doc. # 31 at 7. Although Priestley submitted the Agreement of Sale to Beneficial with the Pallas loan application, he did *not* disclose the Modification Agreement or the "unwritten understandings" to Beneficial. Both the Agreement of Sale and the Modification Agreement were dated July 27, 1988 and apparently drafted by Priestley. While the Agreement of Sale contains a brief integration clause (viz., "[t]his Agreement contains the entire understanding of the parties...."), a preamble in the Modification Agreement plainly states that the parties "are desirous of clarifying and modifying their respective obligations" under the Agreement of Sale. Doc. # 18, Ex. 1, at 5–6, Ex. 2 at 1.

Pertinent contingencies or conditions contained in the Modification Agreement included: (1) the Priestley Group was not required to settle on the purchase of Unit One until at least one additional floor in the building was sold (the "minimum sales" condition); (2) Dalphon and Olmstead were to transfer property they owned, located at 1208 West Street ("the West Street property"), to Pallas; and Pallas, in turn, was to credit Dalphon and Olmstead $80,000 as the "down payment" on the Unit One purchase price;

and (3) a "walk-away" provision: if Dalphon or Olmstead failed to settle on the agreement to purchase Unit One due to their own acts or omissions, Dalphon and Olmstead would simply forfeit $10,000 from the West Street property sale proceeds. Also pertinent was a "tax-free exchange" condition, which was one of the "unwritten understandings" among Priestley, Olmstead and Dalphon. This condition required Pallas to complete the renovations on the Shipley Street property within 180 days after the close of the sale of the West Street property so the Unit One purchase would occur within 180 days of that sale and thus qualify as a tax-free exchange under the Internal Revenue Code[2]. Doc. # 31 at 7–9. The possibility of a tax-free exchange was mentioned in the Agreement of Sale presented to Beneficial, but not in the form of a condition:

> Seller *may* apply the proceeds from this transaction in a tax free exchange in accordance with Section 1031 of the Internal Revenue Code. *This tax treatment shall have no effect on Purchaser and Seller indemnifies Purchaser from any and all liabilities therefrom.* (emphasis added).

Doc. # 18 Ex. 1 at 4.

After what were described by Priestley as lengthy negotiations, Beneficial sent Priestley a draft loan commitment letter dated January 18, 1989. In typical fashion, the commitment letter set forth a number of representations which the borrower would make by counter-signing the letter. In that letter, Beneficial articulated its understanding at that time that none of the three contracts were subject to contingencies:

> Borrowers hereby represent that Agreements of Sale between Pallas Properties, Inc. and Jeffrey L. Olmstead, George W. Dalphon, Jr., and Everett P. Priestley dat-

ed July 27, 1988, Pallas Properties, Inc., and Delaware counsel on Crime and Justice dated July 12, 1988, and Pallas Properties, Inc., and Richard E. Yerger dated November 21, 1988, all of which have been submitted to the Bank in conjunction with this loan application, *are in full force and effect, with all contingencies removed, and that the purchasers under each of the subject agreements are ready, willing and able to proceed to settlement upon completion of the renovations* for the units described in each of the subject contracts. (emphasis added)

Doc. # 18 Ex. 6 at 5.

On January 23, 1989, Priestley sent Beneficial a letter requesting a number of changes to the commitment letter. Regarding the existence of contingencies, Priestley's letter made no reference to the Modification Agreement or the "unwritten understandings" relating to the Unit One sale, but stated:

> The last section of Paragraph 6 talks about contingencies having been removed from my contracts of sale. I do have three fully executed agreements for the sale of units. However it is not accurate, nor possible, to say that all contingencies have been removed in all regards. For example, the Ticor Agreement is subject to final written agreement by Ticor as to a lease. This was explained in a letter from Mr. Richard Yerger who is the Delaware Manager. Likewise the DCCJ contract looks firm but is not unconditional. They have received $90,000.00 in grants but do not yet have a mortgage commitment.

Doc. # 18 Ex. 7.

Beneficial prepared a second commitment letter dated February 1, 1989. With regard to contractual contingencies, that commitment letter stated the three contracts were

---

**2.** Section 1031 of the Internal Revenue Code provides in pertinent part:
(a) Nonrecognition of gain or loss from exchanges solely in kind.—
(1) In general.—No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment.
(3) Requirement that property be identified and that exchange be completed not more than 180 days after transfer of exchanged property....

"in full force and effect, and that, *subject only to certain contingencies or conditions set forth in Everett Priestley's letter of January 23, 1989*" the purchasers were ready, willing and able to proceed to settlement upon completion of the renovations. Doc. # 18 Ex. 8 at 5. (emphasis added) Priestley signed this commitment letter on February 8, 1989.

The loan closing took place on February 23, 1989. The loan documents, including the $900,000 promissory note, were executed by Pallas, Priestley, individually, and Mr. and Mrs. Priestley, individually, as the "Borrowers".

Priestley, through Pallas, began renovating the Shipley Street property, but found he seriously underestimated the cost of the project. In fact, Priestley had experienced cost overruns in excess of $198,000. In the meantime, the West Street property was sold sometime during the first quarter of 1989. By the time the 180 day tax-free exchange deadline had approached, which was November, 1989, Priestley had run out of money and was unable to complete the renovations. Because the Shipley Street property renovations had not been completed in time for Dalphon and Olmstead to effect a tax-free exchange, Olmstead, and apparently Dalphon, walked away from the deal to purchase Unit One. Unit One was finally sold on February 28, 1991 to unrelated purchasers for a reduced price of $400,000.

The Borrowers (Pallas and the Priestleys) having defaulted on the Beneficial loan, entered into a forbearance agreement with Beneficial on June 28, 1990. Subsequently, the Borrowers defaulted on the forbearance agreement as well. As a result, Beneficial caused a judgment by confession to be entered in its favor against Priestley on June 17, 1992, in the U.S. District Court for the Eastern District of Pennsylvania, in the amount of $859,546.01. On October 15, 1992, Beneficial commenced an action to conform the confessed judgment, and a judgment by default was entered in the amount of $785,233.63, plus interest from the date the original judgment by confession was entered, costs and attorney's fees. Another of Priestley's creditors, Prudential Resources Management and Prudential Relocation Management, Inc., filed an involuntary Chapter 7 petition against Priestley on June 24, 1994. An order for relief was entered on September 26, 1994. Beneficial filed a proof of claim for an amount in excess of $1,000,000. Beneficial filed its nondischargeability complaint on January 17, 1995 and trial of this matter was held on June 12, 1995.

### DISCUSSION

Priestley contends Beneficial failed to prove he made a false representation preventing his loan from being discharged under either Code §§ 523(a)(2)(A) or 523(a)(2)(B). Priestley further contends that Beneficial's costs, attorney's fees, interest and late charges are dischargeable, regardless of Beneficial's success in obtaining a nondischargeability determination on the principal debt. To succeed on its nondischargeability claim, Beneficial must prove all of the elements of Code § 523(a)(2)(B) or, in the alternative, Code § 523(a)(2)(A) by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286–288, 111 S.Ct. 654, 659–660, 112 L.Ed.2d 755 (1991).

### Section 523(a)(2)(B)

Code § 523(a)(2)(B) excepts from discharge debts incurred by a debtor based on a false written statement regarding financial condition [3]. To have Priestley's debt declared nondischargeable under this Section,

**3.** Section 523(a)(2)(B) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;

Beneficial must prove that Priestley made a statement (1) in writing; (2) respecting his financial condition; (3) which is materially false; (4) upon which Beneficial reasonably relied; and (5) with the intent to deceive Beneficial. *In re Cohn*, 54 F.3d 1108, 1114 (3rd Cir.1995).

■ Priestley clearly made a false representation by executing the February 1, 1989 commitment letter, and failing to disclose the terms of the Modification Agreement and the "unwritten understandings" to Beneficial. The February 1, 1989 commitment letter signed by Priestley made the explicit representation to Beneficial that the three agreements of sale, copies

> of which have been submitted to the Bank in conjunction with this loan application, are in full force and effect, and that, subject only to certain contingencies or conditions set forth in Everett Priestley's letter of January 23, 1989, the purchasers under each of the subject agreements are ready, willing and able to proceed to settlement upon completion of the renovations for the units described in each of the subject contracts.

Doc. # 18 Ex. 8 at 5.

Of course, Priestley's January 23, 1989 letter refers only to contingencies in the contracts for the two smaller condominium units. Nowhere is there even a hint of any contingencies for the sale of Unit One. However, it is patently clear that the Modification Agreement and the unwritten understandings embody several material contingencies limiting the obligations of the parties to go forward with the purchase of Unit One, particularly the "walk-away" and tax-free exchange provisions, and provisions related to the nature of the down payment. By signing the February 1, 1989 commitment letter and failing to disclose all aspects of the deal, Priestley clearly made a false representation in writing.

■ Priestley contends his omissions were not misrepresentations of his financial condi-

tion. Under Code § 523(a)(2)(B), a lender has the burden of proving that a debtor made a false written representation "respecting the debtor's ... financial *condition.*" The term "financial condition" is undefined in the Code. Some Courts have narrowly defined statements of "financial condition" as those contained in balance sheets, profit and loss statements, and statements of net worth. *In re Sansoucy*, 136 B.R. 20, 22 (Bankr. D.N.H.1992); *In re Seaborne*, 106 B.R. 711, 713–714 (Bankr.M.D.Fla.1989); *In re Pollina*, 31 B.R. 975, 976 (D.N.J.1983). However, the majority of the reported decisions on the issue articulate a broader definition of "financial condition"—one which encompasses statements concerning the condition or quality of a single asset or liability impacting on the debtor's financial picture. *See, e.g., In re Engler*, 744 F.2d 1060 (4th Cir.1984) (statements of financial condition include statements regarding encumbrances on an asset); *In re Boice*, 149 B.R. 40, 46 (Bankr.S.D.N.Y. 1992) (a statement concerning home ownership qualifies as a statement of financial condition); *In re Cook*, 46 B.R. 545, 548–549 (Bankr.E.D.Va.1985) (list of property owned by debtor to secure a loan is a statement of a debtor's financial condition); *In re Prestridge*, 45 B.R. 681, 682 (Bankr.W.D.Tenn. 1985) (statement of a debtor's financial condition includes a warranty deed stating property is "free and unencumbered"); *In re Roberts*, 54 B.R. 765, 769–771 (Bankr.D.N.D. 1985) (a statement describing the state of collateral pledged to bank as security is one concerning the debtor's financial condition). This latter approach is supported by the Code's language, which refers not just to financial statements, but to the broader category of statements "respecting the debtor's ... financial condition". *In re Engler* at 1060.

In the instant case, Priestley's omissions concerning the Unit One purchase deal misrepresented the condition or quality of an asset used for collateral, the Shipley Street

---

(iii) on which the creditor to whom the debtor is liable for such money, property, services, reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

property. This collateral impacted Priestley's financial picture. The renovation project's viability was directly linked to the value of the Shipley Street property, Priestley's ability to sell or lease the units, and to repay the loan. Therefore, Priestley's misrepresentation qualifies as a statement of financial condition.

■ Priestley maintains his omissions were not material to Beneficial's lending decision, claiming that some of the contingencies or conditions had already been satisfied before Beneficial granted the loan. A false representation's materiality to a lending decision is a question of law, judged by an objective standard. *In re Cohn*, 54 F.3d 1108, 1115 (3rd Cir.1995). The Court in *Cohn* articulated two indicia for determining the materiality, or importance, of a misrepresentation: whether (1) "the lender would have made the loan had he known of the debtor's true financial condition"; and (2) the false representation influenced the lender's decision to extend credit. *Id.* Additionally, the *Cohn* court has also held that "a statement can still be material if it is so substantial that a reasonable person would have relied upon it, even if the creditor did not *in fact* rely upon it in the case at hand." *In re Cohn*, 54 F.3d at 1114.

In the instant case, Priestley's omissions concerning the Unit One deal clearly influenced Beneficial's lending decision, in that the deal was a major component of the project. The contracts of sale for the condominium units influenced Beneficial's decision, in that Beneficial depended on the condominium sales proceeds to repay the loan. The $555,000 Unit One deal, in particular, consisted of more than half of the $900,000 loan request, and thus was the major contract within the entire project. According to Robert M. Matsko ("Matsko"), Beneficial's commercial lending representative who handled this loan, Beneficial relied on the Agreement of Sale in making its lending decision. Trans. at 9–10.

Because the Unit One deal was so important, undisclosed conditions concerning the deal had an impact on Beneficial's lending decision. For example, Beneficial was clearly influenced by Priestley's representation that he would make an $80,000 equity investment. According to a January 4, 1989 proposal Matsko prepared for Beneficial's loan committee, using information supplied by Priestley, Beneficial took comfort in Priestley's $80,000 cash equity payment, due to the risks associated with an unrenovated building. Doc. # 18 Ex. 4 at 2. However, one of the Unit One deal's provisions, contained in the Modification Agreement, specified that the $80,000 payment would be satisfied by the transfer to Pallas of the West Street property. Doc. # 18 Ex. 2 at 3. Beneficial had no knowledge of the West Street property, nor of the fact that its transfer to Pallas was intended to satisfy the $80,000 equity investment. Trans. at 21. Matsko testified that Beneficial never saw the Modification Agreement until long after the loan was in default. Trans. at 11–12. Matsko further testified that had Beneficial known about the undisclosed conditions, the loan would not have been approved. Trans. at 12–14; Doc. # 18 Ex. 2, ¶¶ 1 and 2; and Doc. # 18 Ex. 4 at 2. Even assuming, arguendo, that the conditions had been satisfied prior to the time Beneficial made its lending decision, the undisclosed aspects of the Unit One deal deprived Beneficial of the opportunity to properly assess its risks in loaning money for the project. Another example of how undisclosed information influenced Beneficial's lending decision is the tax-free exchange provision. According to Matsko's testimony, knowing about this condition would have been critical, in that equity for the deal would have come, not from cash equity from the borrower, but from the sale of another property. Trans. at 19. Clearly, Beneficial would not have granted the loan had the "tax-free exchange" condition been disclosed. Therefore, based on the foregoing, I find Priestley's omissions were material to Beneficial's lending decision.

■ Priestley next argues that Beneficial's reliance, if existent, was unreasonable, in that "[a]ny misunderstanding regarding the contingencies ... was caused by the

Bank's own attorneys in improperly drafting the final commitment letter." Def.'s Amended Mem.Opp.Disch. at 14, n. 10. Reasonable reliance is a question of fact judged by an objective standard. *In re Cohn*, 54 F.3d at 1117–1118. The lender must exercise that degree of care which a reasonably cautious lender would exercise in the same transaction under similar circumstances. *Id.* at 1117. The court in *Cohn* outlined three factors for assessing reasonable reliance:

(1) the creditor's standard practices in evaluating credit-worthiness (absent other factors there is reasonable reliance where the creditor follows it normal business practices); (2) the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by debtor); and (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).

*Id.*

Beneficial has shown it exercised reasonable care in approving Priestley's loan. According to Matsko, the information he used for the loan proposal included personal financial statements from Priestley, Priestley's 1987 Federal Income Tax return, and the contracts of sale for three units at the Shipley Street property. Although there was no testimony regarding the normal industry standards for approving these type of loans or Beneficial's normal approval process, there was no "red flag" that would have signaled Priestley's failure to disclose all aspects of the Unit One purchase deal. To the contrary, in light of Beneficial's prior lending relationship with Priestley, and the series of correspondence exchanged between Priestley and Beneficial concerning contractual conditions, any expectation on Beneficial's part that it had complete and accurate information was justified. Additionally, the undisclosed information could not have been known to Beneficial absent full disclosure from Priestley. Therefore, I find that Beneficial's reliance on Priestley's statements was reasonable.

The next issue is whether Priestley intended to deceive Beneficial. The Courts have recognized the difficulty of proving deceitful intent with direct evidence, in that people will rarely admit to having such intentions. *In re Cohn*, 54 F.3d at 1118–1119; *In re Chryst*, 177 B.R. 486, 499–500 (Bankr. E.D.Pa.1994). Therefore, the *Cohn* court has held that the intent to deceive may be established by circumstantial evidence, such as proof of a debtor's reckless indifference for the accuracy of a representation. *In re Cohn*, 54 F.3d at 1119.

In the instant case, Priestley, an experienced real estate attorney, at a minimum showed reckless disregard for the truth. As the maker and promoter of the deal and as the apparent author of the paperwork covering it, Priestley knew that several undisclosed contingencies existed regarding the Unit One purchase deal, yet, he failed to disclose them. After receiving the January 18, 1989 commitment letter which contained the representation that all three contracts were not subject to contingencies, Priestley sent Beneficial a clarification letter to effect changes in the commitment letter. With respect to the three contracts, Priestley stated that not "all contingencies have been removed in all regards." He then gave the details:

For example, the Ticor Agreement is subject to final written agreement by Ticor as to a lease. This was explained in a letter from Mr. Richard Yerger who is the Delaware Manager. Likewise the DCCJ contract looks firm but is not unconditional. They have received $90,000.00 in grants but do not yet have a mortgage commitment.

Doc. # 18 Ex. 7.

Given Priestley's intimate involvement with the Modification Agreement and its funda-

mental impact on the Unit One deal, Priestley's failure to reference the contingencies can only be viewed as a willful non-disclosure. Indeed, his use of the phrase "for example" suggests the use of clever wording designed to avoid making a blatant misrepresentation. Priestley now argues that his January 23, 1989 letter is evidence he told Beneficial there were certain undisclosed contingencies and thus did not intend to deceive Beneficial. However, it should have been clear to Priestley that Beneficial believed all contingencies had been disclosed in the January 23, 1989 letter, based on Beneficial's statement to that effect contained in the February 1, 1989 commitment letter. Yet, instead of taking the opportunity of clarifying Beneficial's misconception, Priestley signed the February 1, 1989 commitment letter. Therefore, I find Beneficial met its burden of proving Priestley intended to deceive Beneficial.

Priestley next argues that in order for Beneficial to prevail under Code § 523(a)(2)(B), it must show that its losses were proximately caused by Priestley's misrepresentations. However, Priestley's position with respect to Code § 523(a)(2)(B) is inconsistent with the express language of the Code, which does not articulate a proximate causation requirement. Any required element under Code § 523(a)(2)(B), which is a creature of statute rather than of the common law, must be included in the statutory language. *See Field v. Mans,* —— U.S. ——, ——, 116 S.Ct. 437, 443, 133 L.Ed.2d 351 (1995). The court in *Cohn,* by limiting its analysis to the express statutory elements of Code § 523(a)(2)(B), further demonstrated that no showing of proximate causation is required under Code § 523(a)(2)(B). *In re*

*Cohn,* 54 F.3d at 1114–1118. Based on the foregoing, I find that Priestley's debt is non-dischargeable by reason of Code § 523(a)(2)(B).

## Section 523(a)(2)(A)

Code § 523(a)(2)(A) bars from discharge debts arising from extensions of credit "obtained by ... false pretenses, a false representation, or actual fraud"[4]. Fraud includes an omission of a material fact. *In re Haining,* 119 B.R. 460, 461 (Bankr. D.Del.1990). False pretenses have been defined as the creation of a false impression. *Id.* To prevent the discharge of a debt under Code § 523(a)(2)(A), a creditor has the burden of proving (1) the debtor made a representation; (2) knowing the representation was false; (3) with the intent to deceive the creditor; (4) upon which the creditor justifiably relied. *Field v. Mans,* —— U.S. ——, ——, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995); *In re Haining,* 119 B.R. at 463.

Based on my above findings under Code § 523(a)(2)(B), I find that (1) Priestley's omissions constituted a false representation and created a false impression; (2) Priestley knew his representation was false; (3) Priestley intended to deceive Beneficial[5]; and (4) Beneficial justifiably relied on Priestley's misrepresentation.

Priestley argues that Beneficial cannot prevail under Code § 523(a)(2)(A), because its loan losses were proximately caused, not by Priestley's misrepresentations, but by Priestley's underestimation of the renovation costs for the Shipley Street property. Priestley contends Beneficial, as an experienced construction lender, should have anticipated such miscalculations. Priestley further

**4.** Section 523(a)(2)(A) provides, in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; . . .

**5.** An intent to deceive under Section 523(a)(2)(A), as under Section 523(a)(2)(B), may be shown when a debtor having the opportunity to know, makes a reckless representation. *In re Gramolino,* 183 B.R. 565, 567 (Bankr.E.D.Mo.1995); *In re Roberti,* 183 B.R. 991, 1009 (Bankr.D.Conn. 1995).

contends that "if the undisclosed terms had not existed, the bank still would have suffered its losses on the default." Doc. # 31 at 19. Beneficial argues, in response, that Code § 523(a)(2)(A) requires no showing proximate causation.

Code § 523(a)(2)(A), unlike Code § 523(a)(2)(B), derives its substantive terms from common law fraud. Despite the absence of an expressed requirement in Code § 523(a)(2)(A), a lender must establish a causal link between the false representation and the extension of credit. *See Field v. Mans,* —— U.S. at —————, 116 S.Ct. at 441–443. Proximate causation requires a lender to show that but for the borrower's misrepresentation, the lender would not have incurred the loss. *In re Miranda,* 172 B.R. 55, 60 (Bankr.E.D.Mo.1994). This standard will be satisfied, even in the presence of other contributing factors, as long as the misrepresentation was material to the lender's decision to grant the loan and the lender's losses were a foreseeable consequence of the debtor's conduct. *U.S. v. Spicer,* 57 F.3d 1152, 1157–1160 (D.C.Cir.1995); *Britton v. Price,* 950 F.2d 602, 604–605 (9th Cir.1991).

In the case at hand, Beneficial has proven its losses were a foreseeable consequence of Priestley's material omissions. As discussed previously, the Unit One deal was critical to Beneficial's decision to lend, in that it was the largest contract in the Shipley Street property renovation the unit sales of which Beneficial looked to for repayment on the loan. The Unit One deal's undisclosed "walk-away" provision allowed Dalphon and Olmstead the freedom to walk away from the deal with the only consequence being the loss of $10,000. So, it was not surprising to hear Olmstead's testimony that he walked away from the deal to purchase Unit One because the renovations were not completed in time for the tax-free exchange to take place. Trans. at 68. Priestley contends the tax-free exchange was meaningless, in that he had run out of money to complete Unit One long before the 180–day period for the tax-free exchange expired. Although the underestimated renovation costs certainly impacted the deal, the inability of Dalphon and Olmstead to effect a tax-free exchange was a substantial contributing factor in the deal's collapse. Based on Matsko's testimony, it is clear Beneficial would not have extended Priestley the loan had it been aware of these undisclosed provisions. Under the circumstances, Beneficial's losses were foreseeable. Therefore, I find that Beneficial has met its burden of showing proximate causation under Code § 523(a)(2)(A). For the foregoing reasons, I find that Priestley's debt to Beneficial is nondischargeable under Code § 523(a)(2)(A).

### Attorney's Fees, Interest And Costs

The next issue presented is whether a lender who successfully obtains a nondischargeability determination under Code § 523(a)(2) is entitled to recover ancillary costs, including attorney's fees and interest. Beneficial is claiming a contractual right to attorney's fees, costs, late charges and interest, while Priestley contends Beneficial has no right to those fees and costs, notwithstanding any contractual claim to them.

There is a split of authority regarding the issue of the dischargeability of ancillary costs associated with a nondischargeable debt under Code § 523(a)(2). Many courts agree that such fees should be held nondischargeable [6], but are in disagreement as to the proper legal theory for declaring these fees nondischargeable. Some courts advocate the view that the dischargeability of attorney's fees turn on the dischargeability of the underlying debt—if the principal loan is deemed nondischargeable, then the ancillary costs, including attorney's fees, are also nondischargeable. *See, e.g., DuPhily v. DuPhily,* 52 B.R. 971, 978 (D.Del.1985) (dealt with ancillary obligations in connection with alimo-

---

**6.** For a thorough discussion of the different theories concerning the dischargeability of attorneys fees, see *In re Weinstein,* 173 B.R. 258, 269–273 (Bankr.E.D.N.Y.1994) and *In re Ziegler,* 109 B.R. 172, 174–176 (Bankr.W.D.N.C.1989).

ny and support matters under Code § 523(a)(5)); *In re Hunter*, 771 F.2d 1126, 1131 (8th Cir.1985) (dealt with fees and costs in a misrepresentation suit under Code § 523(a)(2)(A)). Other courts, adopting a more limited view, would award attorney's fees, costs, interest and late charges where an independent basis for them existed, such as a state court judgment, statute or contract. *In re Jordan*, 927 F.2d 221 (5th Cir. 1991) *overruled in part on other grounds* by *Coston v. Bank of Malvern*, 991 F.2d 257, 260 (5th Cir.1993); *In re Martin*, 761 F.2d 1163 (6th Cir.1985); *In re Ziegler*, 109 B.R. at 175. Some courts, on the other hand, have held that prevailing creditors have no right to attorney's fees, costs or interest, despite the existence of a judgment or a valid contractual provision for such fees. *See Sciscoe v. Leistner*, 164 B.R. 86, 89 (S.D.Ind.1993) and *In re King*, 135 B.R. 734 (Bankr.W.D.N.Y.1992). In reliance on the latter cases, Priestley argues that the "debt" excepted from discharge when a creditor prevails under Code § 523(a)(2) does not include attorney's fees, because Code § 523(a)(2) excepts from discharge debt only "to the extent obtained by . . ." the debtor's misrepresentation [7].

■ Citing *In re Smith*, 72 B.R. 300, 301 (Bankr.M.D.Fla.1987), Priestley contends that such fee awards are "inconsistent with the rehabilitative aim of the Bankruptcy Code." Doc. # 31 at 22. However, the rehabilitative, "fresh start" policy of the Bankruptcy Code is only intended for honest debtors. Dishonest debtors are not entitled to discharges. *Grogan v. Garner*, 498 U.S. at 285–287, 111 S.Ct. at 659; *In re Silva*, 125 B.R. 28, 30 (Bankr.C.D.Cal.1991); *In re Wilson*, 12 B.R. 363, 369 (Bankr.M.D.Tenn.1981).

Priestley cites *In re Senty*, 42 B.R. 456 (Bankr.S.D.N.Y.1984) as controlling. The credit card debtor in *Senty* entered into an agreement with Diners Club. This agreement contained a provision assessing costs and attorney's fees if the delinquency were referred to an attorney for collection. *In re Senty*, 42 B.R. at 461, n. 5. The court in

*Senty* found the consumer debtor did not contemplate attorney's fees in a nondischargeability proceeding when he signed such a general agreement to pay attorney's fees and collection costs. *Id.* at 461. Such boilerplate agreements are typical in agreements between consumers and credit card companies. *In re McDonald*, 177 B.R. 212, 219 (Bankr.E.D.Pa.1994).

*Senty* is distinguishable from the instant case. Here, Priestley is more sophisticated than the average consumer credit card debtor. Priestley is an experienced attorney and a real estate developer who, by his own admission, actively negotiated the terms of the loan. In upholding a prevailing lenders' right to contractual collection costs and attorney's fees, one court explained the rationale for holding sophisticated debtors responsible for such fees and costs:

> When equally sophisticated parties negotiate a loan agreement that provides for recovery of collection costs upon default, courts should presume, absent a clear showing to the contrary, that the creditor gave value, in the form of a contract term favorable to the debtor or otherwise, in exchange for the collection costs provision.

*In re United Merchants and Manufacturers*, 674 F.2d 134, 137 (2nd Cir.1982). *But cf. In re McDonald*, 177 B.R. at 219, n. 6 (where the court found such a presumption would be inapplicable in the small consumer loan context).

■ I agree with the court in *In re Jordan*, 927 F.2d at 226–27, which rejected a narrow reading of Code § 523(a)(2). There the court found that while the debtors were technically correct in stating that the Code does not expressly award attorney's fees where creditors successfully contest discharge, "[i]t was equally clear, however, that 'creditors are entitled to recover attorney's fees in bankruptcy claims if they have a contractual right to them valid under state law . . . .' ". *Id.* (quoting *Security Mortgage Co. v. Powers*, 278 U.S. 149, 153–54, 49 S.Ct.

7. See supra, FN. 3.

84, 85–86, 73 L.Ed. 236 (1928)). The Fifth Circuit referenced an oft-cited Sixth Circuit opinion *In re Martin,* 761 F.2d 1163 (6th Cir.1985). In finding that attorney's fees relating to a nondischargeable principal obligation under Code § 523(a)(2) to also be nondischargeable, the court explained that such a holding was consistent with Code policy:

> We would add that a contrary rule sanctioning the discharge of attorney's fees on a contractual debt otherwise nondischargeable would leave dishonest debtors better off under the Code then under state law without furthering a bankruptcy policy. Accordingly, such a rule would violate the Code's underlying principle that, unless a bankruptcy reason demands it, debtors and creditors should not be treated one way under state law and another way under bankruptcy law. Furthermore, it would impede the Code purpose of discharging only the honest debtor from his debts.

*In re Jordan,* 927 F.2d at 227–28.

*See also In re Ziegler,* 109 B.R. 172 (Bankr. W.D.N.C.1989) ("A majority of the courts deciding cases under § 523(a)(2) and (a)(4) agree with the reasoning in *Martin*....").

Priestley, as a sophisticated debtor, signed an agreement to indemnify Beneficial for "costs and expenses, including reasonable attorney's fees, arising out of or related to" *any* untrue statement or representation made in the Commitment letter. Doc. # 18 Ex. 8, at 13. (emphasis added) Priestley also made general warranties against "any intentional or negligent misrepresentation by Borrowers in conjunction with any of the" loan documents. Doc. # 18 Ex. 8 at 4–5.

Given these explicit undertakings by Priestley, the legal fees and costs arising out of a nondischargeability proceeding would clearly be viewed as consequences which Priestley should have anticipated.

█ Based on the foregoing, I am not persuaded that I should disturb the contractual rights of the parties regarding attorney's fees, costs, interest and late charges, and therefore, I find these costs nondischargeable along with the underlying debt. Priestley agreed to indemnify Beneficial against attorney's fees and costs, and to pay interest on the loan. Such agreements are valid under Delaware law, as long as the attorney's fees do not exceed the statutory maximum, which is 20% of the amount due for principal and interest. 10 *Del.C.* § 3912 [8]; *First Federal Savings Bank v. CPM Energy Systems Corp.,* Del.Super., 1994 WL 233870, CA. No. 88C–MY–249–1CV, Toliver, J. (April 29, 1994); *Besk Oil, Inc. v. Brown & Bigelow, Inc.,* 1988 WL 139953, Stiftel, P.J. (December 16, 1988).

### CONCLUSION

Based on the foregoing, I find that Priestley's debt to Beneficial, consisting of principal, interest, attorney's fees, costs, and late charges, is nondischargeable by reason of Code §§ 523(a)(2)(A) and (B) due to Priestley's intentionally deceptive conduct in obtaining the $900,000 loan in February 1989.

Counsel for Beneficial should present an order on notice.

---

**8.** Title 10 *Del.C.* § 3912 provides:

> In all causes of action, suits, matters or proceedings brought for the enforcement of any note, bond, mechanics lien, mortgage, invoice or other instrument of writing, if the plaintiff or lien holder in the action, suit or proceeding recovers judgment in any sum, he may also recover reasonable counsel fees, which shall be entered as part of the judgment in the action, suit or proceeding. Such counsel fees shall not in any such action, suit or proceeding, exceed 20 percent of the amount adjudged for principal interest. Such counsel fees shall not be entered as a part of such judgment unless the note, bond, mortgage, invoice or other instrument of writing sued upon, by the terms thereof, expressly provides for the payment and allowance thereof, except in the case of mechanics liens in which no express agreement shall be necessary in order to entitle the lien holder to his reasonable counsel fees.