## In re Vernon Curtis SMITH, Debtor.

## Bank of Commerce, an Oklahoma Bank, Plaintiff,

### v.

## Vernon Curtis Smith, a/k/a Curtis Smith, Defendant.

### Bankruptcy No. 00–00182–M. Adversary No. 01–0190–M.

United States Bankruptcy Court, N.D. Oklahoma.

May 30, 2002.

---

Harlan S. Pinkerton, Jr., Tulsa, OK, for Plaintiff.

Gary M. McDonald, Tulsa, OK, for Defendant.

## MEMORANDUM OPINION

TERRENCE L. MICHAEL,
Bankruptcy Judge.

THIS MATTER came on for trial on May 16, 2002. Plaintiff Bank of Commerce ("Bank") appeared through its attorney, Harlan S. Pinkerton, Jr. Defendant Vernon Curtis Smith ("Dr. Smith") appeared personally and through his attorney, Gary A. McDonald. At trial, the Court received evidence and heard argument from the parties. The Court also considered the statement of admitted facts contained in the Pre–Trial Order filed in this adversary proceeding on February 5, 2002. The following findings of fact and conclusions of law are made pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52.

### Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.A. § 1334(b).[1] Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C.A. § 157(a). This is a core proceeding as contemplated by 28 U.S.C.A. § 157(b)(2)(I).

### Burden of Proof

The Bank seeks an order of this Court determining that an obligation owed to Bank by Dr. Smith is non-dischargeable under § 523(a)(2)(B). The burden of proof in this action is upon Bank to establish each of the elements under § 523(a)(2)(B) by a preponderance of the evidence. See *Grogan v. Garner*, 498 U.S. 279, 287–288, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Exceptions to discharge are to be narrowly construed in favor of the debtor. See *In re Black*, 787 F.2d 503, 505 (10th Cir.1986); see also *AT & T v. Herrig (In re Herrig)*, 217 B.R. 891 (Bankr.N.D.Okla.1998).

### Findings of Fact

Dr. Smith is a licensed chiropractor. He operates his practice through a corporation known as Woodland Health, Inc. ("Woodland"), in which he is the sole shareholder. Sometime in 1996, Dr. Smith became involved in a commercial painting business known as New Wave Painting Company ("New Wave"). New Wave was incorporated on May 8, 1997, with Dr. Smith as one of its shareholders. Dr. Smith initially "managed the checkbook" for New Wave, but was never involved in bidding for painting contracts or performing work.

In 1997, New Wave was profitable. The tide turned in 1998, when New Wave lost approximately $30,000. According to Dr. Smith, the loss was the result of embezzlement of approximately $60,000 by a former employee. Litigation ensued, which was ultimately settled by the payment of $10,000 to the employee in exchange for any and all of his interests in New Wave. At the conclusion of the litigation, New Wave remained a company with good employees, good contracts and the potential for future success. However, New Wave was in serious need of operating capital.

New Wave's search for capital led Dr. Smith to the Bank, where he met with

---

1. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq.* (West 2002).

Curtis Carter ("Mr.Carter") sometime in early August of 1999.[2] Mr. Carter was an executive vice president of the Bank, with lending authority of $100,000. They discussed the possibility of obtaining a loan from the Bank to provide capital for New Wave. Mr. Carter indicated that while the Bank was interested in making such a loan, it must be personally guaranteed by Dr. Smith. As part of the loan application process, the Bank required a personal financial statement from Dr. Smith, as well as financial information regarding Woodland and New Wave.

Dr. Smith provided the Bank with unaudited financial statements regarding Woodland and New Wave. Those statements showed that, as of March 31, 1999, New Wave had a negative net worth of $120,159.[3] The financial statement of Woodland indicated a corporate net worth of $18,088; however, the statement listed "goodwill" as an asset with a value of $110,445. Without this "goodwill", Woodland was insolvent. Woodland also indicated that it had paid total salaries during the first three months of 1999 of $27,812, and listed no distributions to shareholders during that same time period.

Dr. Smith provided the Bank with a personal financial statement dated "as of" February 3, 1999. In that statement, Dr. Smith listed assets of $634,000 and liabilities of $217,534, for a net worth of $417,046. The statement included a listing of the following assets:

| | |
|---|---|
| Investment Real Estate: | $ 80,000 |
| Partnerships: | $362,000 |
| Motor Vehicles: | |
| 1955 MGTB | $ 15,500 |
| 1975 Porsche | $ 20,000 |

*See Defendant's Exhibit 10.* The schedule dealing with investment real estate includ-

ed a listing of two properties, one located at "227 East Young Place" and another located at "1307 Trenton, Tulsa" (the "Trenton Property"). The Trenton Property was listed with a fair market value of $30,000. With respect to the investment real estate and partnerships, the financial statement provided for the inclusion of an additional schedule in order to provide more detail regarding the particular assets. The schedule with respect to interests in partnerships was blank. The schedule contained a notation that "[f]or investments which represent a material portion of your total assets, please include the relevant financial statements or tax returns, or in the case of partnership investments or S-corporations, schedule K-1s." The only financial information provided to the Bank with respect to corporations or partnerships in which Dr. Smith held an interest was the information relating to New Wave and Woodland. The financial statement also reflected annual income for Dr. Smith of $140,500, of which $60,000 was listed as salary and an additional $80,000 as "S. Corporation." The Bank made no effort to verify any of the information contained on Dr. Smith's financial statement, nor did the Bank conduct any sort of lien search with respect to the assets listed on the financial statement.

Dr. Smith valued the 1955 MGTB and the 1975 Porsche at their fully restored values. At the time, the 1955 MGTB had not been restored, and was in some undisclosed state of disassembly. With respect to the 1975 Porsche, Dr. Smith testified that he purchased the vehicle for $13,000 and spent an additional $19,000 restoring the same. Dr. Smith and Mr. Carter had some discussion regarding these vehicles,

---

2. The Bank had not previously dealt with New Wave, Woodland or Dr. Smith.

3. According to Mr. Carter, the Bank had a policy of accepting and treating as current any financial information less than one year old.

due in part to Mr. Carter's interest in classic cars. According to Mr. Carter, Dr. Smith never told him that the MGTB was not fully restored. Dr. Smith denies this. The Court finds that the Bank was not informed of the actual condition of the 1955 MGTB, and that the value of the same as listed on the financial statement was not accurate. The Court also finds that the valuation of the 1975 Porsche at $20,000 was reasonable, given the purchase price and monies expended on restoration of this vehicle.

The Court heard extensive testimony regarding the Bank's practices and loan policies. According to Mr. Carter and Troy Anderson ("Mr.Anderson"), another loan officer for the Bank,[4] it was the practice of the Bank to require a personal guaranty from shareholders of a closely held corporation when it loaned money to such a corporation. As part of the application process, the Bank would require each guarantor to provide a personal financial statement. The Bank did not require the statement be on a form generated or provided by the Bank. The Bank accepted any financial statement less than one year old at the time of the loan application. Unless the Bank intended to take a security interest in any of the items listed on a guarantor's personal financial statement, the Bank made no independent effort to verify the information contained on the statement. The Court was provided with no evidence to show whether these policies of the Bank fell within generally accepted standards in the banking industry.

According to Mr. Carter, the financial strength of Dr. Smith was a key factor in the Bank's decision to extend credit to New Wave. The Bank would not have made the loan to New Wave without the guarantee of Dr. Smith. On cross-examination, Mr. Carter admitted that had the financial statement shown a net worth of $400,000 (as opposed to $417,000), he would have authorized the loan to New Wave. Although he was less certain, Mr. Carter also admitted that there was a possibility that the Bank would have made the loan to New Wave if the financial statement had listed a net worth for Dr. Smith of $350,000.

On August 23, 1999, the Bank loaned New Wave the sum of $100,000. The loan was made on a short-term basis, with all principal and interest due on February 21, 2000. Dr. Smith personally guaranteed the New Wave indebtedness to the Bank. As security for the loan, the Bank took a security interest in two painting subcontracts with an unpaid value of $310,000. The Bank also filed the necessary financing statements in order to perfect its lien upon the contracts. The term of the loan was to correspond with the completion (and, ostensibly, the payment) of the two subcontracts pledged as collateral. The Bank required that the contractors on the two contracts make all payments to New Wave in a form jointly payable to New Wave and the Bank. Each of the contractors agreed to do so.

New Wave did not complete the two painting jobs due to disputes between New Wave and the contractors. Neither New Wave nor the Bank received any proceeds from the contracts. New Wave defaulted on the note, and filed a petition under Chapter 7 of the Bankruptcy Code on December 4, 2000.

On or about January 8, 2001, the Bank obtained a judgment against Dr. Smith in the amount of $131,902.13. Due in large

---

4. Mr. Carter was employed at the Bank until sometime in 1999, after the loan was made to New Wave. Mr. Anderson succeeded Mr. Car- ter as the Bank officer responsible for the New Wave loan.

part to this judgment, Dr. Smith filed his own Chapter 7 case on February 9, 2001. At the first meeting of creditors, the Bank learned that Dr. Smith had sold two of the motor vehicles, the 1955 MGTB and the 1975 Porsche, to his father. The MGTB was sold for a total price of $750, while the Porsche was sold for $3,000, plus assumption of a loan secured by the Porsche in the approximate amount of $8,000. Dr. Smith testified that each of these sales were distressed sales and that he sold the MGTB and the Porsche to raise cash and to prevent repossession of the Porsche. In addition, it was discovered that title to the Trenton Property was not in the name of Dr. Smith, but in the name of a corporation wholly owned by Dr. Smith. Notwithstanding this fact, the Trenton Property is being administered as an asset of Dr. Smith's bankruptcy estate.

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," such items are incorporated herein by this reference.

### Conclusions of Law

■ The Bank seeks a determination that the obligations of Dr. Smith to the Bank under his guaranty are non-dischargeable under § 523(a)(2)(B). That section excepts from discharge any debt

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

\* \* \*

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

§ 523(a)(2)(B). The Bank must establish each of these elements by a preponderance of the evidence. *Ins. Co. of North America v. Cohn (In re Cohn)*, 54 F.3d 1108, 1113–1114 (3rd Cir.1995) (citing *Grogan v. Garner*, 498 U.S. 279, 286–287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)) (hereafter *"Cohn"*); *see also Marx v. Reeds (In re Reeds)*, 145 B.R. 703, 706 (Bankr. N.D.Okla.1992).

· The Bank contends that the financial statement submitted by Dr. Smith was false in that it improperly valued the 1955 MGTB and the 1975 Porsche, and failed to disclose that the Trenton Property was not owned by Dr. Smith, but rather by a corporation wholly owned by Dr. Smith. The Court finds, for the reasons set forth below, that the Bank did not reasonably rely on the financial statement supplied by Dr. Smith. Accordingly, the debt owed by Dr. Smith to the Bank is dischargeable, and the Court need not consider any of the other elements under § 523(a)(2)(B).

■ This Court adopts the test for reasonable reliance under § 523(a)(2)(B) set forth by the United States Court of Appeals for the Third Circuit in *Cohn:*

The reasonableness of a creditor's reliance under § 523(a)(2)(B) is judged by an objective standard, i.e., that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances.

A determination of reasonable reliance requires consideration of three factors: (1) the creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices); (2) the standards or

customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by debtor); and (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).

*Cohn*, 54 F.3d at 1117 (citations omitted); *see also Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir.1993); *First Bank of Colo. Spgs. v. Mullet (In re Mullet)*, 817 F.2d 677, 679 (10th Cir.1987) ("This standard of reasonableness [under § 523(a)(2)(B) ] places a measure of responsibility upon a creditor to ensure that there exists some basis for relying upon the debtor's representations.").[5] The determination of whether a creditor has reasonably relied upon a financial statement is a question of fact to be decided on a case by case basis. *Id.; see also In re Morris*, 223 F.3d 548, 553 (7th Cir.2000) (citation omitted).

In the present case, Mr. Carter made the decision on behalf of the Bank to loan money to New Wave. He testified that he considered the financial statement provided by Dr. Smith "in its entirety," relying upon the overall net worth of Dr. Smith as critical in his decision to approve the loan. The Court finds that as Mr. Carter considered the financial statement, he either overlooked or chose to ignore the following "red flags":

(1) The statement of annual income ($140,500) was not supported by the financial statements of New Wave and Woodland submitted in conjunction with the loan application. The salaries for *all* employees of Woodland during the first three months of 1999 was approximately $27,000, which would equate to less than $110,000 for the year. Even if this entire amount were paid to Dr. Smith, it would not equal the annual compensation of $140,500 listed in the financial statement.

(2) The financial statement was incomplete with respect to Dr. Smith's interests in partnerships and professional corporations. Dr. Smith listed a total value of these interests of $362,000, comprising approximately 57 percent of his total assets. The financial statement required a detailed listing of those interests on Schedule D, and also contained a requirement that "[f]or investments which represent a material portion of your total assets, please include the relevant financial statements or tax returns, or in the case of partnership investments or S-corporations, schedule K–1s." Notwithstanding this requirement, these assets were not identified in any way, shape or form. In addition, the financial statement for New Wave revealed a significant negative net worth for that corporation, while the financial statement for Woodland showed a minimal

---

5. Some courts have held that the reasonable reliance requirement under § 523(a)(2)(B) "cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith." *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1166 (6th Cir. 1985); *see also In re Garman*, 643 F.2d 1252 (7th Cir.1980). The Court, having reviewed these decisions, respectfully declines to follow them.

net worth ($18,000) based entirely on goodwill.

To summarize, the Bank had in its possession an incomplete financial statement, together with other information which would reasonably bring into question the accuracy of the information contained on that statement. Notwithstanding this fact, the Bank failed to undertake even minimal investigation of the representations contained in the financial statement. The Court is at a loss to understand the Bank's concerns with the valuation of assets worth less than $40,000, when it apparently had no difficulty accepting as valid unidentified, unsubstantiated interests in partnerships and professional corporations listed at $362,000.[6] The Bank had no prior business dealings with New Wave, Woodland or Dr. Smith. As the Court was provided with no evidence regarding the general standards utilized by the banking industry in reviewing and assessing financial statements, it is unable to determine whether the Bank's conduct could have fallen within such standards. These factors preclude a finding of reasonable reliance by the Bank upon the financial statement of Dr. Smith.

### Conclusion

The claims of the Bank against Dr. Smith are dischargeable in this bankruptcy case. A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

---

6. Interestingly, the Bank does not contend that Dr. Smith falsely represented the value of these interests.