In re Thomas W. ADAMS and Susanne H. Adams, Debtors.

Lyndon Property Insurance Company, Plaintiff,

v.

Thomas W. Adams and Susanne H. Adams, Defendants.

Bankruptcy No. B–02–82729C–7D. Adversary No. 02–9038.

United States Bankruptcy Court, M.D. North Carolina, Greensboro Division.

July 12, 2004.

Dirk W. Siegmund, Greensboro, NC, for Debtors and Defendants.

John A. Northen, Chapel Hill, NC, for Trustee.

C. Hamilton Jarrett, Raleigh, NC, for Plaintiff.

Phillip E. Bolton, Greensboro, NC, for Defendants.

## MEMORANDUM OPINION

### WILLIAM L. STOCKS, Chief Judge.

This adversary proceeding came before the court on January 15 and March 19, 2004, for trial. C. Hamilton Jarrett appeared on behalf of the plaintiff Lyndon Property Insurance Company, Dirk W. Siegmund appeared on behalf of defendant Thomas W. Adams and Phillip E. Bolton appeared on behalf of defendant Susanne H. Adams.

## NATURE OF PROCEEDING

This is a dischargeability proceeding in which the plaintiff alleges that indebtedness of the defendants is nondischargeable pursuant to § 523(a)(2)(B) of the Bankruptcy Code. Plaintiff's claim arises out of payment and performance bonds issued by the plaintiff as surety for Summit Companies, LLC.

## FACTS

Plaintiff is a corporation engaged in the surety business, including the issuance of performance and payment bonds as surety for contractors. Cumberland Surety Insurance ("Cumberland") is a general agent of the plaintiff whose business includes procuring surety business on behalf of the plaintiff and is authorized to issue bonds on behalf of the plaintiff. Summit Companies, LLC ("Summit") was a limited liability company engaged in the construction business as a general contractor. As of February 2000, defendant Thomas W. Adams ("Mr.Adams") was managing member and an officer and employee of Summit. Defendant Susanne H. Adams, the spouse of Mr. Adams ("Ms.Adams"), was a member of Summit until July of 2000, but was not an officer or employee of the company.

On January 20, 2000, Summit entered into a contract with the State of North Carolina under which Summit contracted to perform certain construction work with regard to the Student Activity Center at the North Carolina School of the Arts in Winston–Salem, North Carolina (the "the School of the Arts Project"). Under the

contract, Summit was required to provide payment and performance bonds with a suitable surety before beginning work on the Project. In February 2000, Mr. Adams was actively seeking the required bonds for the School of the Arts Project, and submitted certain information, including financial information, to Cumberland through a bond agency known as Bonds Only, Inc., which was assisting Mr. Adams in obtaining bonding for the School of the Arts Project. On or about February 25, 2000, Summit and Mr. Adams, individually, executed and submitted to Cumberland a General Agreement of Indemnity in which they agreed to indemnify the plaintiff with respect to any losses sustained by the plaintiff as a result of having issued bonds on behalf of Summit. Ms. Adams did not sign the General Agreement of Indemnity.

On or about March 7, 2000, at the request of Mr. Adams and Summit, plaintiff, as surety, issued payment and performance bonds for the School of the Arts Project ("the Bonds"), with Summit as principal, the State of North Carolina as Obligee and the plaintiff as surety for Summit. The issuance of the Bonds on behalf of the plaintiff was approved and authorized by Cumberland as general agent for the plaintiff. Under the payment bond, the plaintiff, in effect, agreed to pay any of Summit's suppliers or subcontractors on the School of the Arts Project that were not paid by Summit up to the face amount of the payment bond. Under the performance bond, the plaintiff, in effect, agreed to perform Summit's contract on the School of the Arts Project if Summit failed to do so, up to the face amount of the performance bond. The face amount of the Bonds was $3,121,341.00.

Summit performed work on the School of the Arts Project, receiving regular progress payments from the State of North Carolina, from April of 2000 until March of 2002. Summit had not completed all of the work on the School of the Arts Project when, by letter dated March 8, 2002, the State advised Summit and plaintiff that Summit had failed to meet its contractual obligations on the School of the Arts Project, and that unless Summit met such obligations within fifteen (15) days, Summit would be declared in default. Summit, by letter dated March 18, 2002, advised the State that it was financially unable to complete the work on the School of the Arts Project and that it was terminating all work on the Project. When Summit left the project in March of 2002, the work called for under the bonded contract had not been completed and numerous suppliers and subcontractors who had furnished labor and materials to Summit for the Project had not been paid. As a result of Summit's default in failing to complete the work required under the bonded contract and failing to pay its suppliers and subcontractors on the Project the plaintiff incurred losses which totaled $1,593,554.01 as of January 13, 2004, consisting of payments made pursuant to the Bonds and expenses incurred as a result of the default by Summit.

## DISCUSSION

The most common case for application of § 523(a)(2)(B) is one in which a debtor submits a false financial statement to a lending institution in order to obtain a loan and the creditor is induced to make the loan as a result of the false financial statement. Such a situation easily fits within the literal language of § 523(a)(2)(B), i.e., there is a "debt...for money...obtained by use of a statement in writing...that is materially false..." However, the cases involving § 523(a)(2) illustrate that the applicability of § 523(a)(2) is much broader than the case in which the debt is for loan proceeds which are not repaid. *See Gro-*

*gan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (Debtor fraudulently induced the creditor to purchase corporate securities which were worthless); *In re Rubin*, 875 F.2d 755 (9th Cir.1989) (Debtor fraudulently induced homeowners to sell their residence for less than its true value). It also has been applied in cases in which the creditor was an insurance company induced to issue a policy of insurance or surety bond by false representations or false financial documents submitted by a debtor. *See In re Dallam*, 850 F.2d 446 (8th Cir.1988) (Debtor fraudulently induced insurance company to issue a policy of title insurance); *In re Barber*, 95 B.R. 684 (Bankr.W.D.Mo.1988) (title insurance company induced to issue a title policy as a result of a false affidavit). In these and similar cases, § 523(a)(2) has been interpreted to make nondischargeable the loss or damage sustained by a creditor as a result of being induced into virtually any type of business transaction by fraud, false representations, false pretenses or fraudulent financial statements on the part of the debtor. This is the view of § 523(a)(2)(B) adopted by the plaintiff in the present case. Thus, the plaintiff's theory is that in obtaining the Bonds the defendants submitted documents to the plaintiff that were materially false regarding the financial condition of Summit which fraudulently induced plaintiff to issue the Bonds and that defendants are liable to plaintiff for the damages sustained by plaintiff as a result of the issuance of the Bonds. Plaintiff further contends that such damages constitute a nondischargeable "debt" under § 523(a)(2)(B) of the Bankruptcy Code. This is a permissible theory under the language of § 523(a)(2)(B), which leads to the question of what must be shown by the plaintiff in order to establish such claim.

■ Under § 523(a)(2)(B) a debt is nondischargeable if it is for money, property, services or an extension, renewal or refinancing of credit obtained by the use of a statement in writing (1) that is materially false; (2) respecting the debtor's or an insider's financial condition; (3) that is reasonably relied upon by the creditor; and (4) that was published by the debtor with intent to deceive. In an action under § 523(a)(2)(B) the creditor has the burden of proof by a preponderance of the evidence on each of the elements required under that section of the Bankruptcy Code. *See Grogan v. Garner*, 498 U.S. 279, 288, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991); *In re Stanley*, 66 F.3d 664, 667 n. 4 (4th Cir.1995); *In re Booker*, 165 B.R. 164, 168 (Bankr.M.D.N.C.1994); *In re Showalter*, 86 B.R. 877, 880 (Bankr.W.D.Va.1988).

■ It is undisputed that Summit sought bonding from the plaintiff in February of 2000 and that Mr. Adams directed and controlled the steps that were taken in doing so. The evidence established that Mr. Adams was a member or shareholder of Summit, as well as the chief executive officer and person who managed and controlled the business affairs and operations of Summit. Mr. Adams sought the assistance of Bonds Only, Inc., an independent bonding agency, and submitted an application and supporting documents to Bonds Only, Inc. for use in obtaining bonds from the plaintiff for the School of the Arts project. The steps that were directed and controlled by Mr. Adams regarding such bonds included the preparation and assembly of the application and supporting documents that were used in seeking the bonds. These documents were sent to Bonds Only by Mr. Adams with the knowledge and intent that the application and supporting documents would be relied upon by the plaintiff in deciding whether to issue bonds as surety for Summit. The documents that were submitted by Mr. Adams included a Contractors Surety Ap-

plication Questionnaire, prepared on a form supplied by Bonds Only, which contained various information regarding Summit. Although some of the answers contained in this document were typed by Bonds Only, it was received by Mr. Adams containing such answers, who then added some information to it in handwriting. By returning the Questionnaire to Bonds Only after he had prepared other documents to accompany the Application Questionnaire, Mr. Adams adopted it and made it his own document. *See In re Michael,* 265 B.R. 593, 598 (Bankr.W.D.Tenn.2001) (the "writing" requirement of § 523(a)(2)(B) is satisfied by producing a written statement "signed, adopted or used" by the debtor).

■ The Application Questionnaire was accompanied by a Contractor's Qualification Statement that was prepared entirely by or under the supervision of Mr. Adams and was signed by Mr. Adams as the manager of Summit. Attached to the Contractor's Qualification Statement were Item 3.4 purporting to list projects that were then under construction by Summit and attached Item 3.5 purporting to list projects that previously had been completed by Summit as well as projects that had been completed under the direct supervision of Mr. Adams. Also included in the documents submitted by Mr. Adams was a document containing a short biography regarding Mr. Adams and some of the other employees of Summit, three letters of recommendation for Summit and a copy of a Summit bank statement. Finally, the documents that were submitted by Mr. Adams prior to the issuance of the Bonds included a balance sheet for Summit as of September 30, 1999. Although not in the format of a typical financial statement, these documents contain financial information and satisfy the requirement contained in § 523(a)(2)(B) that there be a written document respecting "financial condition".

*See In re Bogdanovich,* 292 F.3d 104, 112–13 (2d Cir.2002); *Engler v. Van Steinburg,* 744 F.2d 1060, 1060–61 (4th Cir.1984); *In re Copeland,* 291 B.R. 740, 780–82 (Bankr. E.D.Tenn.2003).

Moreover, although the foregoing documents pertained to the financial condition of Summit rather than the debtor/defendant, Mr. Adams, they are the type of documents covered by § 523(a)(2)(B). This is true because § 523(a)(2)(B) applies to documents respecting the debtor's financial condition *or* the financial condition of an insider. Under § 101(31) of the Bankruptcy Code, if the debtor is an individual, an insider includes a corporation of which the debtor is a director, officer or person in control. Mr. Adams was an officer and the person in control of Summit when the financial documents regarding Summit were submitted to the plaintiff and at all relevant times thereafter. Hence, Summit is an "insider" and the documents pertaining to its financial condition that were submitted to plaintiff are documents which are subject to § 523(a)(2)(B). *See generally* 4 COLLIER ON BANKRUPTCY ¶ 523.08[2][c] (15th ed. rev.2004). The court now must decide whether such documents were materially false, whether the plaintiff reasonably relied upon the documents in issuing the bonds, and whether Mr. Adams was aware of the false statements and submitted the documents with intent to deceive.

■ The documents submitted to the plaintiff clearly contained false statements. One of the questions on the Contractors Surety Application Questionnaire (PX–11) is: "Are any liens for labor and/or material filed against company on any contracts which have been done or are being done by Company?" Mr. Adams answered this question in the negative through a "n/a" (i.e., not applicable) answer to the question. A similar question appears in Sec-

tion 3.2.2 of the Contractor's Qualification Statement (PX–11) which was signed by Mr. Adams: "Are there any judgments, claims, arbitration proceedings or suits pending or outstanding against your organization or its officers?" Mr. Adams answered this question an unqualified and unequivocal "NO". Both of these answers were false and known by Mr. Adams to be false when he signed the documents on February 4, 2000. In actuality, during the six or so months preceding these answers liens and lawsuits had been filed against Summit in at least 12 instances by suppliers or subcontractors. When Mr. Adams signed the Contractor's Qualification Statement on February 4, 2000, at least 6 of those liens and lawsuits were unresolved and pending against Summit. The suppliers and subcontractors who were pursuing liens and suits against Summit included Triangle Building Supply, K.R. Mace Electric Company, Builder's First Source, Watson Electric Company, Jimmy Connor Construction Company and TRB Supply Company, involving claims of $18,945.00, $8,305.00, $7,481.00, $100,932.00, $48,177.00 and $17,250.00, and involving several different projects on which Summit was general contractor. In addition to these pending liens and suits, when the bond application documents were submitted by Mr. Adams in early February, Summit was struggling to complete three unfinished projects where Summit was behind in paying its subcontractors and suppliers and experiencing difficulties with the architect on the projects. Yet, in the Contractor's Qualification Statement, Mr. Adams represented that "Summit Companies, LLC is A rated and is unlimited bonding capacity." On at least two of the unfinished projects Mr. Adams had been notified that the owners would be issuing joint checks to Summit and its subcontractors as a result of Summit's failure to pay the subcontractors in a timely manner. An indication of the poor status of these projects and the precarious condition of Summit is that within two weeks after the Contractor's Qualification Statement and other documents were submitted, and several days before the actual issuance of the Bonds on March 7, 2000, Mr. Adams notified the surety for those jobs that Summit needed a loan from the surety in order to meet its payroll. Within a short time after that, the surety on those jobs had to begin making payments to Summit's suppliers and subcontractors under its bonds, ultimately paying out $852,160.17 under its bonds (PX–26).

The September 30, 1999 financial statement that was submitted to the plaintiff by Mr. Adams also contained false information. This statement was represented by Mr. Adams as being the latest balance sheet available in February of 2000 when the bond application was submitted to the plaintiff. This financial statement (PX–9) was a compilation which was prepared by Dixon Odom PLLC, Summit's accountants. Since the statement involved a compilation rather than a review, it was prepared from information which Mr. Adams caused to be supplied to Dixon Odom rather than Dixon Odom having reviewed Summit's records and gleaned for itself the information used in preparing the compilation. This financial statement showed Summit as having owner's equity or working capital of $457,476.00 as of September 30, 1999. However, according to plaintiff's expert, Mr. Strange, a comparison between the Quick Book records maintained by Summit and this statement revealed that approximately $800,000.00 of liabilities were omitted from the September 30 financial statement and that the September 30 financial statement overstated Summit's working capital by more than $400,000.00. A reasonable inference from the evidence is that Mr. Adams supplied information to the

accountants which omitted $800,000.00 of payables, knowing and intending that the result would be a financial statement which overstated the owners' equity and working capital for Summit, and the court so finds. Although the testimony of Mr. Adams disputed these findings by plaintiff's expert, the testimony of Mr. Adams was not credible and the court has accepted the testimony of plaintiff's expert, Mr. Strange, whose testimony was credible.

■ In evaluating whether the above-described false statements regarding the financial condition of Summit are material for purposes of § 523(a)(2)(B), the court will use a standard that has been utilized by a number of other courts. Under that standard, material misrepresentations are substantial inaccuracies of the type which would generally affect a lender's decision and a statement is materially false if it portrays a substantially untruthful picture of a financial condition by misrepresenting information of the type which normally would affect the decision to grant credit. *See e.g., In re Candland,* 90 F.3d 1466, 1470 (9th Cir.1996); *In re Furio,* 77 F.3d 622, 625 (2d Cir.1996). Under this standard, the false statements contained in the documents submitted by Mr. Adams clearly constitute material misrepresentations. The false representation that there were no suits or liens pending when, in fact, there were six liens and suits pending involving amounts ranging from $7,481.00 to $100,932.00 involved a substantial inaccuracy. The same is true of the false representation that Summit had working capital of $457,476.00 which involved an overstatement of more than $400,000.00. Whether there are liens and suits pending against a contractor and whether a contractor has working capital constitute vital information of the type ordinarily relied upon by a surety in deciding whether to bond a contractor. Considering the number and magnitude of the false statements contained in the documents submitted by Mr. Adams regarding these critical factors, such documents were substantially inaccurate as a whole. Such documents presented a substantially untruthful picture of the financial condition of Summit by misrepresenting information of the type which normally would affect the decision of a surety to issue bonds on behalf of a contractor and hence were materially false.

■ The evidence also established that there was actual reliance upon the false information submitted by Mr. Adams. When the bonds were issued in March of 2000, Cumberland was a general agent for the plaintiff. As such, Cumberland had the authority to approve the issuance of bonds on behalf of the plaintiff. It is undisputed that Bonds Only submitted the Application Questionnaire, the Contractor's Qualification Statement, the September 30, 1999 financial statement, and the other bond application documents to Cumberland after they were received from Mr. Adams. These documents were received by Mr. Helmbrecht of Cumberland and relied upon by Mr. Helmbrecht in authorizing the issuance of the Bonds for the School of the Arts Project. A reasonable inference from the testimony of Mr. Helmbrecht is that his decision to issue the Bonds would have been different if he had known that Summit had negative working capital and was experiencing problems on its jobs when the application was submitted, and the court so finds. Mr. Burrows confirmed in his deposition testimony that the Bonds would not have been issued if the plaintiff had known of Summit's problems with liens and suits on other jobs (Depos., p. 15). According to the evidence, an important factor in the decision to issue bonds is the ratio between a contractor's working capital and the amount of the bonds which generally should not be less

than a ratio of 1 to 10. The $457,476.00 of working capital shown in the September 30 financial statement provided a ratio well in excess of the minimum and was a significant factor that prompted the issuance of the bonds. Under § 523(a)(2)(B), reliance upon false statements need not be the sole reason that a loan was extended or renewed or other types or property or consideration was provided. *See In re Branham,* 126 B.R. 283, 291 (Bankr.S.D.Ohio 1991); *In re Barron,* 126 B.R. 255, 259 (Bankr.E.D.Tex.1991); *In re Hall,* 109 B.R. 149, 154 (Bankr.W.D.Pa.1990). It is sufficient if a creditor shows that the false statement was a substantial factor in causing the creditor to extend money or credit, without which the loan would not have been made. *See In re Dunston,* 146 B.R. 269, 279 (D.Colo.1992); *Teachers Credit Union v. Johnson,* 131 B.R. 848, 855 (W.D.Mo.1991). Plaintiff's evidence in the present case was sufficient to make such a showing.

▮▮▮▮▮ In addition to showing actual reliance upon a false financial statement, a creditor seeking relief under § 523(a)(2)(B) also must show that such reliance was reasonable. Reasonable reliance under § 523(a)(2)(B) must be determined on a case-by-case basis judged in the light of the totality of the circumstances after an examination of facts and circumstances present in the case. *See In re Copeland,* 291 B.R. at 784. The standard is objective reasonableness. *See In re Brevard,* 200 B.R. 836, 845–46 (Bankr. E.D.Va.1996). Although this standard is a more demanding standard than the justifiable reliance standard required under § 523(a)(2)(A), the court finds from the evidence that Cumberland's reliance upon the false representations regarding Summit's financial condition in issuing the Bonds on behalf of the plaintiff was reasonable under the totality of the circum-

stances present in this case. At the time the documents were submitted to Cumberland, there were no disclosures or indications presented to Cumberland that Summit was experiencing financial or other difficulties. To the contrary, the representation was that it was an "A" rated company with unlimited bonding capacity. The documents submitted by Mr. Adams were complete and not erroneous on their face. There were no "red flags" indicating that the financial information contained in the documents might not be accurate and reliable and it would have required considerably more than a minimal investigation in order to discover the falsity of the application and supporting documents. A detailed analysis of the business records of Summit would have been required in order to ascertain that false information had been furnished to the accountants who performed the compilation upon which the September 30, 1999 statement was based and an extensive examination of public records in North Carolina would have been required to order to discover the existence of the pending suits and liens. In summary, the court finds that the plaintiff acted in good faith in accepting and relying upon the documentation submitted by Mr. Adams and that plaintiff's reliance upon such documentation, including the false representations regarding pending liens and suits and Summit's working capital, was reasonable based upon the totality of the circumstances involved in this case.

▮▮▮▮▮ The plaintiff also is required to prove that Mr. Adams knew that the statements that there were no pending liens or suits and that Summit had working capital of $457,47.00 were false and that such false statements were published by Mr. Adams with the intent to deceive. The plaintiff carried this burden. The evidence showed that Mr. Adams managed the business of Summit on a day-to-day basis and was

intimately familiar with the business records and business operations of Summit. The court is satisfied and finds from the evidence that Mr. Adams was aware of the correct figure for Summit's payables and was aware that the September 30 statement understated the payables and dramatically overstated Summit's working capital. Likewise, as the active manager of Summit, the court finds that Mr. Adams was aware of the liens and suits that had been filed against Summit and realized the falsity of answering that there were no pending liens or suits. Mr. Adams had many years of experience in the construction business and had extensive experience in obtaining bonds from other bonding companies. He was aware of the purpose of submitting an application to a surety company and was aware that a surety receiving an application and supporting documents would rely upon such documents in deciding whether to issue bonds. These and the other surrounding circumstances, established that Mr. Adams had the intention of deceiving the plaintiff regarding the condition of Summit. This is true even though there were no direct admissions by Mr. Adams that he intended to deceive or other direct evidence of his intention to do so. Such direct evidence of intent to deceive is not required under § 523(a)(2)(B). Instead, because it is nearly impossible to obtain direct proof of a debtor's state of mind, a creditor may present evidence of the surrounding circumstances from which such intent may be inferred. *In re Van Horne*, 823 F.2d 1285, 1287 (8th Cir.1987); *In re Garthe*, 58 B.R. 62 (Bankr.M.D.Fla.1986). *See also In re Brewer*, 66 B.R. 214, 218 (Bankr.S.D.N.Y. 1986) (it can be inferred that a debtor intends to deceive a creditor by submitting false information regarding the debtor's financial condition as "the debtor will be held to have intended the natural consequences of her act."). The debtor does not overcome this inference with an unsupported assertion of honest intent. *See Van Horne*, 823 F.2d at 1287. In the present case, the surrounding circumstances were more than sufficient to establish that Mr. Adams intended to deceive the plaintiff through the false statements regarding the financial condition of Summit.

 Finally, the evidence established that the plaintiff suffered extensive losses as a result of its reliance upon the false statements regarding the financial condition of Summit. Such reliance led to the issuance of the Bonds with the plaintiff as surety and the issuance of the Bonds, in turn, led to large losses as a result of plaintiff being obligated to make payments under the Bonds following Summit's default on the School of the Arts Project. Additional losses were sustained by the plaintiff as a result of plaintiff having incurred expenses for legal and technical assistance in evaluating and adjusting the claims that were presented under the Bonds following the default by Summit. Such payments and expenses were proximately caused by the fraud of Mr. Adams in submitting the materially false documents pertaining to the financial condition of Summit which fraudulently induced the issuance of the Bonds by the plaintiff.[1] It

---

1. Courts are split on whether a § 523(a)(2)(B) analysis contains a causation element. *See In re Davis*, 262 B.R. 673, 682 (Bankr.E.D.Va. 2001). Some courts have likened a claim under § 523(a)(2)(B) to a common law fraud claim and held that in order to recover, a plaintiff must show that their damages were proximately caused by the false financial information. *See In re Siriani*, 967 F.2d 302, 306 (9th Cir.1992); *In re Johnson*, 242 B.R. 283, 292 (Bankr.E.D.Pa.1999); *In re Hall*, 109 B.R. 149, 153 (Bankr.W.D.Pa.1990); *In re Compton*, 97 B.R. at 976–77 (Bankr. N.D.Ind.1989); *In re Anzman*, 73 B.R. 156, 163 (Bankr.D.Colo.1986); *Brewer*, 66 B.R. at 218–19; *In re Long*, 44 B.R. 300, 309–10

is well settled that a corporate officer or agent may be personally liable for damages caused to third parties by his fraud or false representations even though he is acting on behalf of his employer when the fraud or false representations occur. *See Forbes Homes, Inc. v. Trimpi,* 318 N.C. 473, 479, 349 S.E.2d 852, 856 (1986); *Norburn v. Mackie,* 262 N.C. 16, 23, 136 S.E.2d 279, 285 (1964); *Palomino Mills, Inc. v. Davidson Mills Corp.,* 230 N.C. 286, 292, 52 S.E.2d 915, 919 (1949). Plaintiff's evidence established that as of the date of the trial in this proceeding, the plaintiff had sustained and was entitled to recover from Mr. Adams losses totaling $1,593,554.01. For the reasons discussed above, such loss constitutes a debt of Mr. Adams which is nondischargeable pursuant to § 523(a)(2)(B) of the Bankruptcy Code.[2] A judgment so providing shall be entered contemporaneously with the filing of this memorandum opinion.

 The situation is entirely different with respect to Ms. Adams. She had a full time job elsewhere and was not involved in the day-to-day operations of Summit. The evidence did not disclose any personal involvement on her part in obtaining the Bonds that were issued by the plaintiff. There was no evidence that she had any verbal or written communications or involvement of any kind with Bonds Only, Cumberland or the plaintiff. Likewise, there was no evidence that she had any knowledge of or participation in preparing the fraudulent documents that were submitted to the plaintiff. Ms. Adams was not an officer or employee of Summit and was not even a member or shareholder of Summit after July of 2000. Nor was there any evidence that she had any knowledge regarding the contract funds that were received by Summit from the School of the Arts Project or that she had any control over how such funds were spent after such funds were received by Summit. While the evidence did show that Mr. and Mrs. Adams purchased a residence from Summit in May of 2001 at a purchase price of $330,000.00, which was paid in full, there was no evidence of any improper conduct on the part of Ms. Adams regarding the purchase of the residence. Nor was there any showing of any grounds for imposing liability against Ms. Adams as a result of her declining to sign the indemnity agreement in February of 2000 or her withdrawing as a member of Summit in July of 2000. In short, plaintiff showed no basis for imposing any liability upon Ms. Adams with respect to the losses sustained by the plaintiff and hence no claim for relief was shown under §§ 523(a)(2)(A), 523(a)(2)(B) or 523(a)(4) as alleged in the complaint. Accordingly, a judgment dismissing this proceeding with prejudice as to Ms. Adams shall be entered contemporaneously with the filing of this memorandum opinion.

## JUDGMENT

In accordance with the memorandum opinion filed contemporaneously herewith,

(Bankr.D.Minn.1983). However, the weight of appellate authority would suggest that a plaintiff need not show their damages were proximately caused by the defendant's presentation of false financial information as § 523(a)(2)(B) does not include such a requirement, and one should not be read into the section. *See In re Campbell,* 159 F.3d 963, 966 (6th Cir.1998); *In re McFarland,* 84 F.3d 943, 947 (7th Cir.1996), *cert denied,* 519 U.S. 931, 117 S.Ct. 302, 136 L.Ed.2d 220 (1996); *In re Norris,* 70 F.3d 27, 29 n. 6 (5th Cir.1995); *In re Goodrich,* 999 F.2d 22, 25 (1st Cir.1993); *Davis,* 262 B.R. at 682; *In re Priestley,* 201 B.R. 875, 885 (Bankr.D.Del. 1996).

**2.** Since the plaintiff has prevailed on its § 523(a)(2)(B) claim against Mr. Adams, the court need not address the claims asserted against Mr. Adams under § 523(a)(2)(A) and § 523(a)(4).

it is ORDERED, ADJUDGED AND DE-CREED that the plaintiff have and recover of Thomas W. Adams the sum of $1,593,554.01 which is hereby adjudged to be nondischargeable pursuant to § 523(a)(2)(B) of the Bankruptcy Code; and it is further ORDERED, ADJUDGED AND DECREED that the plaintiff have no recovery or relief from Susanne H. Adams and this adversary proceeding is dismissed with prejudice as to Susanne H. Adams.