In re Victor M. CASCIO, Debtor.

Blue Ridge Bank and Trust, Plaintiff,

v.

Victor M. Cascio, Defendant.

Bankruptcy No. 01–20231.
Adversary No. 01–6035.

United States Bankruptcy Court,
D. Kansas.

Dec. 20, 2004.

John J. Benge, Kansas City, MO, for Debtor.

Christopher J. Redmond, Lead Attorney, Kansas City, MO, pro se.

## MEMORANDUM OPINION AND ORDER[1]

ROBERT D. BERGER, Bankruptcy Judge.

This matter came on for trial before the Court on the plaintiff's Complaint. The Complaint asserts that a judgment rendered in plaintiff's favor against the defendant in state court[2] is not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).[3] The evidence is that the defendant, Victor M. Cascio ("Cascio"), made written representations to the plaintiff, Blue Ridge Bank and Trust (the "Bank"), regarding his financial state of affairs (the "Financial Statement") and that the Bank extended to him several loans represented by a series of notes and overdraft coverage on his personal account. The notes were: business loan for $291,525 ($101,433 new money); $100,000 revolving working capital line of credit; and $295,000 to pay off second mortgage on residence. When Cascio defaulted on the notes, the Bank sought and received a money judgment on

---

1. The plaintiff, Blue Ridge Bank and Trust, appears by Michelle M. Suter of Commercial Law Group, P.A., of Leawood, Kansas. The defendant, Victor M. Cascio, appears *pro se*.

2. Johnson County, Kansas, District Court Case No. 97 C 425.

3. Subsequent statutory references are to the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, unless otherwise noted.

the notes and account overdraft. As of February 1, 2001, the date of Cascio's bankruptcy petition, $658,605.94 of the judgment amount remained unsatisfied.[4]

The issues are whether Cascio's Financial Statement was materially false; whether Cascio, by providing the Financial Statement, intended to fraudulently induce the Bank to extend the loans and to cover his account overdrafts; and whether the Bank reasonably relied on the Financial Statement to extend the loans and to cover the account overdrafts.

Following the trial at which only Cascio and the Bank's president, Mr. William C. Esry, appeared as witnesses, the Court took this matter under advisement. As explained more fully below, the evidence and testimony presented at trial were sufficient to establish that the Bank satisfied its burden to prove by a preponderance of the evidence that the Financial Statement was materially false. However, the evidence was insufficient to establish by a preponderance of the evidence that Cascio had the requisite intent to defraud when he presented his Financial Statement to the Bank or that the Bank had reasonably relied on Cascio's Financial Statement. As a result, Cascio is entitled to discharge the Bank's claim in his bankruptcy.

### Jurisdiction

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. A proceeding to determine dischargeability of a particular debt is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

### Factual Background

Prior to the loans and extensions of credit underlying this adversary proceeding, the Bank and Cascio had engaged in a business relationship for more than 36 years during which many loans were made to and paid off by Cascio. Cascio's parents also enjoyed a long-term business relationship with the Bank. Even though this long-term business relationship existed, Mr. Esry testified that when someone applies for a loan, the Bank "[has] to make sure there are secondary sources of repayment." Cascio sought a number of loans that are the subject of this proceeding, and the Bank asked him to sign and present his Financial Statement, which he did on September 24, 1994. Cascio reaffirmed the accuracy of the same document on April 7, 1995. The Bank alleges that it relied on the Financial Statement and thereafter extended several loans, evidenced by a series of notes, and covered overdrafts on Cascio's account. When Cascio subsequently defaulted on the notes and did not repay the account overdraft, the Bank sought and received a money judgment of $776,923.13 plus varying rates of interest thereon. On the date of his bankruptcy petition, February 1, 2001, Cascio still owed the Bank $658,605.94 on this judgment.

In his Financial Statement, Cascio represented that he had a $1,100,000.00 asset in "VICCO/Cadast" (hereinafter "Cadast"), a corporation in which he held a 30 percent equity share, and a $480,000.00 note receivable from "*ARA" (hereinafter "ARA").[5] On the liabilities side, he failed to disclose an obligation of at least $50,064.90 to Cadast.[6]

---

4. The Johnson County trial court awarded the Bank a combined sum of $776,923.13, plus varying rates of interest thereon, on numerous note defaults and an account overdraft.

5. Neither party addressed the significance, if any, of the asterisk in "*ARA."

6. Cascio's obligation to VICCO/Cadast grew from $50,064.90 on August 31, 1993, to $55,196.56 on August 31, 1995.

To support its claim that Cascio's representation of a $1,100,000.00 asset in Cadast was materially false, the Bank offered an affidavit from Marie Cascio, a shareholder, officer and director of Cadast, in which she claimed Cascio's interest in Cadast was not equal to the amount listed on his Financial Statement.[7] However, what the affidavit did not establish was the actual value of Cascio's interest in Cadast. Cascio testified that his interest in Cadast had a fair market value of more than $1,100,000.00. The Financial Statement for Cadast reflected, with depreciation backed out, the following book values: 1993, $1,700,000; 1994, $1,160,000; 1995, $1,090,000. For each of these reporting periods, Cadast had less than $15,000 of outstanding obligations. The real estate held in Cadast was commercial/retail space and most likely had appreciated in value since purchased by Cadast. Therefore, book value as reflected on Cadast's financial reports provided the only evidence of a minimum threshold for valuation.

Cascio testified that the real estate held by Cadast had a market value of at least $3,000,000 and that, in combination with cash and liquid assets held by Cadast, his 30 percent interest in Cadast actually exceeded the $1,100,000 value provided to the Bank in the Financial Statement. However, more than three years prior to filing bankruptcy, Cascio transferred his stock in Cadast to his mother after she paid off a loan of $360,000 related to one of Cascio's companies. The Court has no additional information before it with regard to valuation of Cascio's interest in Cadast. The Court finds Cascio's testimony with regard to the valuation of his interest as the most credible evidence and

therefore concludes that Cascio's interest in Cadast exceeded $1,100,000 when the Financial Statement was signed initially and later re-signed.

The Bank's counsel questioned Cascio and Mr. Esry about unfiled bankruptcy schedules, which were admitted into evidence without objection. These were prepared by Cascio's former counsel and presented in pre-bankruptcy settlement discussions between the parties wherein the value of Cascio's interest in Cadast was scheduled as $110,000.00.[8] Mr. Esry testified that Cascio represented at the settlement meeting that he actually only had 10 percent of the $1,100,000.00 interest in Cadast reflected on his Financial Statement. Cascio stated that the $110,000.00 reflected on the unfiled bankruptcy schedules used in the settlement meeting was a typographical error and that the schedules under-represented the actual value of his interest in Cadast. Although neither party presented additional evidence of the actual value of Cascio's interest in Cadast, Mr. Esry could not deny that he had been informed of transactions, such as the sale of Cadast real estate, that would have perhaps imparted a more accurate valuation of Cascio's interest in Cadast.

Mr. Esry testified that the Bank had been misled that Cascio had a $480,000.00 note receivable. In contrast to his earlier testimony that the Bank must ensure that there are secondary sources for the repayment of a loan, Mr. Esry testified that the Bank did not ask questions regarding the ARA asset on Cascio's Financial Statement. Mr. Esry testified that the amount owed seemed reasonable given Cascio's

---

7. The affidavit was admitted into evidence by stipulation of the parties. Marie Cascio is the debtor's mother. Cadast was a corporation formed by Cascio's parents as a real estate holding company.

8. These were not identical to the bankruptcy schedules ultimately filed with this Court by Cascio.

representations that he had sold one of his business concepts. Cascio acknowledged that the ARA asset was not a note receivable and testified that the Bank had always known that it represented an employment agreement between Cascio and a third party.

The ARA employment agreement, which is dated January 29, 1993, provided for total base compensation of $480,000.00 over a three-year period. The evidence presented, however, indicates that even if the Bank had known the ARA asset represented an employment agreement, the employment agreement had been terminated prior to April 7, 1995, the date Cascio resigned the Financial Statement. In response to this apparent inconsistency, Cascio testified that he did not remove the $480,000.00 asset from his Financial Statement before signing again on April 7, 1995, because he had lawsuits pending over the interpretation of the employment agreement and the finalization of a contract with ARA. Mr. Esry could not deny that Cascio had provided the Bank with information relevant to the litigation and the nature of the ARA asset, all of which could have cast doubt on the representation that the ARA asset listed on the Financial Statement was a note receivable.

In conjunction with the employment agreement with ARA, Cascio was negotiating the sale of two of his companies, Supreme Food Court, Inc., and Victor Cascio & Associates, Inc. The proposed purchaser was ARA. At trial, there was submitted into evidence two unsigned drafts of a letter of intent for sale and purchase of these two companies. The letters provided for a payment to Cascio in the amount of $300,000 upon signature of the letters, plus an additional $700,000 at the closing of the sale. Cascio testified that the sale did not proceed because his corporation, Supreme Food Court, Inc., had not pro-

tected its intellectual property. Litigation ensued against ARA pertaining to the employment agreement and proposed sale. Additionally, a claim was made against the attorneys for Supreme Food Court, Inc., with regard to the alleged failure to handle properly the intellectual property issues. Cascio testified, and Mr. Esry admitted, that Cascio informed Mr. Esry of the litigation arising from the employment contract and the sale of Mr. Cascio's two corporations (Victor Cascio & Associates, Inc., was also involved in the sale).

Although Cascio admitted he did not disclose on his Financial Statement a loan obligation to Cadast slightly in excess of $50,000.00, the Bank did not provide evidence suggesting that disclosure would have materially affected its decision to extend loans or overdraft protection to Cascio.

A brief chronology of the more important events follows:

| | |
|---|---|
| 01–29–1993 | Cascio's employment contract with ARA effected |
| 09–24–1994 | Cascio provided financial statement to Bank |
| 04–07–1995 | Cascio reaffirmed accuracy of financial statement |
| 04–07–1995 | Cascio's ARA employment contract terminated |
| 01–11–1996 | Bank discount committee considers loans |
| Late 1996 | First settlement meeting with Bank |
| 08–22–1997 | Cascio transferred 30% interest in Cadast to his mother, Marie Cascio |
| 02–01–2001 | Cascio filed bankruptcy |

### Discussion

Section 523(a)(2)(B) provides that a debtor is not entitled to discharge a debt if the debt were incurred using a written statement respecting the debtor's or an insider's financial condition (1) that is materially false; (2) on which the creditor reasonably relied; and (3) that the debtor caused to be made or published with the intent to deceive. A plaintiff must prove each of these elements by a preponderance

of the evidence.[9] Exceptions to discharge are narrowly construed, and doubts are resolved in the debtor's favor.[10]

That Cascio made written representations to the Bank regarding his financial state-of-affairs is undisputed. That the Bank thereafter extended Cascio several loans, which were represented by a series of notes and covered an overdraft of his account, is also undisputed. As explained below, the Court finds that Cascio's Financial Statement was materially false. However, the Court further finds that while the Bank may have relied on the Financial Statement in extending Cascio loans and covering his account overdraft, any actual reliance was unreasonable and that Cascio, in providing the Financial Statement, did not intend to fraudulently induce the Bank into extending the loans and covering the account overdraft.

## I. *Materially False*

■ A financial statement is materially false if it "portrays a substantially untruthful picture of a financial condition by misrepresenting information of the type which normally would affect the decision to grant credit." [11] At trial, the Bank focused on the Cadast and ARA assets listed on Cascio's Financial Statement and Cascio's failure to disclose a loan obligation to Cadast slightly in excess of $50,000.00. Although the Court believes the evidence and testimony presented at trial with regard to the Cadast asset and the loan omission is insufficient to warrant finding that the Financial Statement was materially false, it is unnecessary to address those

issues because Cascio's representation of the ARA $480,000.00 note receivable where one did not exist created an untruthful picture of Cascio's financial condition that could affect the Bank's decision to extend credit. Cascio's expressed desire to represent an employment contract or pending litigation as a "note receivable," while relevant to his intention in providing the Financial Statement, does not obviate the obligation to accurately represent assets in the Financial Statement. Such misrepresentations create a substantially untruthful picture of Cascio's financial condition and hence are materially false. However, it should be noted that the aggregate monies that would have been paid to Cascio over the life of the employment contract (three years) was $480,000.00, which coincides with the balance due on the alleged promissory note.

## II. *Reliance*

■ A creditor who seeks relief under § 523(a)(2)(B) must show that its actual reliance upon a false financial statement was reasonable. The determination of whether a creditor has reasonably relied upon a financial statement is a question of fact to be decided on a case-by-case basis.[12] This Court, like the Bankruptcy Court for the Northern District of Oklahoma in *In re Smith*,[13] adopts the following test set forth by the United States Court of Appeals for the Third Circuit in *In re Cohn:*

> The reasonableness of a creditor's reliance under § 523(a)(2)(B) is judged by an objective standard, i.e., that degree of care which would be exercised by a rea-

9. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

10. *Kaspar v. Kaspar,* 125 F.3d 1358, 1361 (10th Cir.1997).

11. *In re Adams,* 312 B.R. 576, 584 (Bankr. M.D.N.C.2004) (citations omitted).

12. *Ins. Co. of N. Am. v. Cohn (In re Cohn),* 54 F.3d 1108, 1117 (3rd Cir.1995); *see also Coston v. Bank of Malvern (In re Coston),* 991 F.2d 257, 261 (5th Cir.1993).

13. *See In re Smith,* 278 B.R. 532, 537–38 (Bankr.N.D.Okla.2002).

sonably cautious person in the same business transaction under similar circumstances.

A determination of reasonable reliance requires consideration of three factors: (1) the creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices); (2) the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by debtor); and (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).[14] Applying these standards to the present case, the Bank's reliance on Cascio's Financial Statement was not reasonable.

■■■ Mr. Esry testified that when someone applies for a loan, the Bank still "[has] to make sure there are secondary sources of repayment," regardless of the length of the business relationship with the customer. Although Mr. Esry also testified that he had no reason to disbelieve the assets listed by Cascio on the Financial Statement, the Bank failed to undertake even a minimal investigation to satisfy its own policy to ensure secondary sources of repayment when evaluating a loan appli-

cant's credit-worthiness. Even if the Bank had satisfied its own standard practices to evaluate credit-worthiness, the representation of a note receivable worth approximately one-half million dollars should reasonably raise a "red-flag" for any lender because of the ease with which it can be verified.[15] Minimal investigation of the $480,000.00 ARA note receivable listed on the Financial Statement would have revealed its true nature and value. Even a copy transmitted via e-mail or fax would have substantiated the veracity of Cascio's representation with minimal financial burden or time commitment from either party. The Bank chose not to undertake this minimal investigation, an omission that belies the Bank's reasonable reliance. While the debtor has a duty of accurate disclosure, the Bank, whose money it is that is loaned, has an obligation to undertake at least some minimal investigation.

■■■ As the Court was not provided evidence regarding the general standards utilized by the banking industry to review and assess financial statements, it is unable to determine whether the Bank's conduct could have fallen within such standards. However, "[i]f a party blindly trusts, where [it] should not, and closes [its] eyes where ordinary diligence requires [it] to see, [it] is willingly deceived."[16] A creditor may not "assume the position of an ostrich with its head in the sand and ignore facts which were readily available to it."[17] Because the Bank failed to undertake even minimal investigation of the Financial Statement and the ARA asset listed thereon, any misstatement committed by Cascio was compounded by the Bank's failure to, with

---

**14.** *See Cohn,* 54 F.3d at 1117 (citations omitted).

**15.** *See Sinclair Oil Corp. v. Jones (In re Jones),* 31 F.3d 659, 662 (8th Cir.1994).

**16.** *See In re Reeds,* 145 B.R. 703, 708 (Bankr. N.D.Okla.1992).

**17.** *Id.*

minimal effort, protect its interests. The facts and circumstances of the Bank's transactions with Cascio, when viewed in their totality, demonstrate that the Bank failed to meet its burden to establish it acted reasonably when it relied on the Financial Statement.

### III. *Intent to Deceive*

Although a debtor's actual intent to deceive is often difficult, if not impossible, to prove on direct evidence, courts have held intent to deceive may be inferred from the totality of the circumstances, including a debtor's reckless disregard for the truth.[18] However, a finding of reckless disregard "should be very narrowly interpreted."[19] The statutory exception to the discharge of debts for money obtained by a materially false financial statement is meant to apply to those debtors who act with dishonest intent and not to those who are merely "careless or presumptuous."[20] In the present case, although the Court finds that Cascio was careless in preparing the Financial Statement, his level of carelessness, in light of the totality of the circumstances, does not rise to the level of reckless disregard for the truth. Central to the Court's conclusion is Cascio's credible testimony that the Bank knew the details of his financial affairs that extended beyond the Financial Statement. In addition, Mr. Esry's testimony, while falling short of verification,

did not refute Cascio's testimony that the Bank was aware of the particulars associated with Cascio's financial status. When asked whether he was informed of transactions tied directly to the valuation of Cascio's Cadast asset, Mr. Esry testified that he was unable to recall any specifics involving the transactions, but that he could not deny it was possible. Mr. Esry could not deny that Cascio provided the Bank with information relevant to the true nature of the ARA asset which would have likely cast doubt on the representation that the ARA asset listed on the Financial Statement was a note receivable. Although Mr. Esry had a vague recollection that he and Cascio had discussed the litigation pertaining to the ARA transaction, there is no evidence that, despite this "red flag," the Bank undertook an investigation of the situation.

The Court finds that Cascio presented his Financial Statement with the belief that the Bank was aware of and understood the facts and circumstances surrounding his financial interests. Although in some respects not a picture of accuracy, Cascio's description and classification of the assets represented in the Financial Statement were not presented with an intent to deceive. The evidence before the Court does not support a finding that Cascio intended to deceive the Bank. As a result, the Bank has failed to meet its

---

**18.** *Accord Driggs v. Black (In re Black),* 787 F.2d 503, 506 (10th Cir.1986), *abrogated in part on other grounds by Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *see also Cohn,* 54 F.3d at 1118–19 (intent to deceive can be inferred from totality of circumstances, including debtor's reckless disregard for the truth); *Equitable Bank v. Miller (In re Miller),* 39 F.3d 301, 305 (11th Cir.1994) (court may look to totality of circumstances, including debtor's recklessness, to infer whether debtor submitted statement with intent to deceive); *Martin v. Bank of Germantown (In re Martin),* 761 F.2d 1163,

1167 (6th Cir.1985) (intent element satisfied if debtor either intended to deceive creditor or acted with gross recklessness).

**19.** *Chevy Chase Bank FSB v. Kukuk (In re Kukuk),* 225 B.R. 778, 787 (10th Cir. BAP 1998) (§ 523(a)(2)(A) context).

**20.** *Enter. Nat'l Bank of Atlanta v. Jones (In re Jones),* 197 B.R. 949, 963 (Bankr.M.D.Ga. 1996) (citing *In re Miller,* 39 F.3d 301 (11th Cir.1994)).

burden to establish that Cascio had the requisite intent to deceive.

### *Conclusion*

For the foregoing reasons, the Court finds that while Cascio's Financial Statement was materially false, the Bank did not prove by a preponderance of the evidence that it reasonably relied upon it or that Cascio presented it to the Bank with an intent to deceive. Accordingly, Cascio's obligation to the Bank is not excepted from discharge.